[Sac. No. 3567. In Bank.—August 2, 1926.]

CALIFORNIA BEAN GROWERS' ASSOCIATION (a Corporation), Respondent, v. RINDGE LAND & NAVIGATION COMPANY (a Corporation), Appellant.

[1] CO-OPERATIVE ASSOCIATIONS — CONTRACT FOR MARKETING BEANS — FAILURE TO DELIVER—ACTION FOR DAMAGES.—In this action to recover liquidated damages, under a marketing agreement by which plaintiff agreed to market and the defendant agreed to consign and deliver to plaintiff, as agent, all of the beans of every variety produced by or ·for defendant during certain years, with certain exceptions, it is held that plaintiff was not liable for its failure to sell certain beans earlier than it did, as it was vested with a reasonable discretion in the marketing of the beans under its control and could not be held accountable for an honest mistake of judgment, if the course pursued by it was apparently warranted by conditions then existing, and that the record shows defendant consented to the delay.

[2] ID.—DELAY IN ACCOUNTING — QUESTION FOR TRIAL COURT.—It is held in this action that under all of the circumstances it was a question of fact for the trial court to determine whether the plaintiff unreasonably delayed accounting to defendant, and that such

delay was not available as a defense in the action, because the defendant had breached its contract by refusing to deliver its crop of beans of a certain year before the plaintiff had sold and received payment for any considerable part of the previous year's crop.

[3] ID.—EXPENDITURES TO INCREASE TARIFF RATES.—In such a case, where the articles of incorporation of the association provided that one of its purposes was to do "each and every thing necessary, suitable or proper, for the accomplishment of any of its purposes or attainment of any one or more of the objects herein enumerated, or which shall at any time appear conducive to or expedient for the interests or benefit of this association, in its proper activities, and to contract accordingly," the association did not exceed its authority in the proper expenditure of a reasonable sum to procure an increase of tariff rates on beans.

[4] ID.—EFFORTS TO INFLUENCE LEGISLATION — LEGALITY OF. — It is neither illegal nor improper to expend such reasonable sums as may appear to be necessary to present, by fair and open means, the merits of any matter advocated before a legislative body; and it is to be presumed, in the absence of evidence to the contrary, that such means only were employed.

[5] ID.—REJECTION OF EVIDENCE—LACK OF ERROR.—It is held in this case, that the trial court did not err, under the circumstances, in refusing to permit the defendant to prove its allegations to the effect that some of the officers and members of the association withdrew from the pool the beans which they had delivered to it in a certain year, that one of the directors did not deliver his crop of beans of another year to the association, and that the chief officer of the association sold his bean crop of certain years directly to dealers and not through the association.

[6] ID.—CONTRACT — DENIAL OF ALLEGATION OF PERFORMANCE. — The rule that, where a plaintiff alleges performance of a contract on his part in general language, the general allegation will not save the complaint where, in addition, he sets out what he has actually done, and such facts fall short of due performance, applies to an answer which denies a general allegation of performance by the plaintiff and, in addition, sets out the particulars in which the plaintiff has failed to perform.

[7] ID.—ACCOUNT STATED—SUFFICIENCY OF EVIDENCE.—It is held in this action that the evidence was sufficient to support the finding of the court to the effect that there was an account stated between the parties and an accord and satisfaction; and that the fact that the relation of principal and agent existed between the parties did not change the rule.

[8] ID.—PRINCIPAL AND AGENT—ACCOUNTING.—When an agent has rendered an account to his principal, it is open to the latter to object either to the fullness or the accuracy of the account; or, on the other hand, to agree to it as a full and accurate account of the agent's transactions, and if he expressly agrees to it, the account will then have ordinarily all the characteristics ·of an account stated; but it is not necessary that the principal's acquiescence shall be expressed; it may be implied from the facts and circumstances as in other cases.

[9] ID.—LEGALITY OF AGREEMENT—TRUSTS—LIQUIDATED DAMAGES.—The agreements between the association and its members in such a case do not constitute an unlawful trust or combination in restraint of trade; and the stipulation in the agreements for liquidated damages is valid, where it is shown that it would be impracticable and extremely difficult to determine the actual damage resulting to the association if the grower fails to consign and deliver his beans to it.

[10] ID.—VIOLATION OF AGREEMENT BY MEMBER—EFFECT OF.—Where the by-laws of such association provide that if a member shall cease, fail, neglect or refuse for any reason whatsoever to market all or any of the beans grown or· owned by him as provided by the agreement, his membership shall *ipso facto* cease and all his rights and interest be automatically canceled, this provision means that the rights of the party violating it cease and that the agreement becomes void and of no effect as to him, but it does not release him from his obligations under ·the agreement to deliver the beans.

[11] ID.—DAMAGES—INTEREST.—In such a case it was not error to allow interest upon the amounts awarded as liquidated damages from the respective dates upon which the defendant refused to deliver his crops of beans, such amounts being capable of being made certain by mere calculation.

---

(1) 2 C. J., p. 998, n. 31 New.    (2) 2 C. J., p. 998, n. 31 New. (3) 2 C. J., p. 998, n. 31 New.    (4) 13 C. J., p. 432, n. 60 New; 22 C. J., p. 144, n. 24.    (5) 2 C. J., p. 998, n. 31 New.    (6) 13 C. J., p. 728, n. 42, p. 754, n. 26 New.    (7) 1 C. J., p. 582, n. 33, p. 728, n. 94.    (8) 1 C. J., p. 580, n. 11 New, p. 582, n. 34 New, p. 695, n. 43, p. 708, n. 13, p. 729, n. 98 New, p. 740, n. 33, 34, 36 New.    (9) 2 C. J., p. 998, n. 31 New; 17 C. J., p. 941, n. 86; 41 C. J., p. 168, n. 76.    (10) 2 C. J., p. 998, n. 31 New.    (11) 17 C. J., p. 967, n. 60.

APPEAL from a judgment of the Superior Court of San Joaquin County. J. A. Plummer, Judge. Affirmed.

---

8. See 1 Cal. Jur. 196; 1 R. C. L. 213.
11. See 8 Cal. Jur. 789; 15 R. C. L. 26.

The facts are stated in the opinion of the court.

A. H. Ashley for Appellant.

Sapiro & Hayes and Sapiro, Levey & Hayes for Respondent.

THE COURT.—The following opinion prepared by Mr. Presiding Justice Finch, sitting *pro tempore* for Mr. Justice Lawlor, is adopted as the opinion and decision of the court.

"The plaintiff is a nonprofit co-operative marketing association and the defendant is one of its members. The general features of the plaintiff's organization and the agreements which it makes with its members are similar to those considered in *Poultry Producers etc.* v. *Barlow,* 189 Cal. 278 [208 Pac. 93], *California Canning Peach Growers* v. *Downey* (Cal. App.), 243 Pac. 679, *Poultry Producers, etc.,* v. *Murphy,* 64 Cal. App. 450 [221 Pac. 962], and *Anaheim Citrus Fruit Assn.* v. *Yeoman,* 51 Cal. App. 759 [197 Pac. 959]. On the seventh day of August, 1918, the parties hereto entered into a marketing agreement by the terms of which the plaintiff agreed 'to market' and the defendant agreed 'to consign and deliver' to the plaintiff as 'agent, . . . and not otherwise, all of the beans of every variety . . . produced by or for' defendant 'during the years 1918–19–20,' with certain exceptions which are not involved herein. The defendant delivered all of its beans produced during the year 1918 to the plaintiff but refused to deliver those of the years 1919 and 1920. Plaintiff brought this action to recover liquidated damages, as provided for in the agreement, alleged to have been sustained by reason of such refusal. The trial court entered judgment in favor of the plaintiff and the defendant has appealed.

"The complaint alleges the execution of the agreement; that 'plaintiff has performed all of the terms, conditions and covenants of said agreement on its part to be performed'; that the defendant refused to deliver the beans produced by it in 1919 and 1920 to the plaintiff; that 'it would be impracticable and extremely difficult to fix and determine the actual damages suffered by plaintiff herein as the result of defendant's failure to deliver said beans'; that the agreement provides that 'inasmuch as it is now and

ever will be impracticable and extremely difficult to determine the actual damage resulting to the association should the grower fail to so consign and deliver his beans, the grower hereby agrees to pay to the association one cent for each pound of beans sold, consigned or marketed by or for him other than in accordance with the terms hereof, as liquidated damages for the breach of this contract, all parties agreeing that this contract is one of a series dependent for its value upon the adherence of each and all of the contracting parties to each and all of the said contracts'; and stating the amount of such liquidated damages.'

"The answer is too long to be set out at length. In addition to copies of the articles of incorporation and the by laws of the plaintiff and the agreement between the parties, it contains about thirty pages of typewritten matter. Some of the allegations are of evidentiary matters and other are immaterial to the questions raised by the appeal. It is alleged that the defendant was induced to become a member of the association and to execute the agreement by certain false representations and promises made by the plaintiff, that the plaintiff negligently failed to take proper care of defendant's beans of 1918 and allowed a part of them to be damaged by moisture and by rats and mice and that 'excessive expenses' were charged against defendant, but the evidence does not support such allegations. The answer 'denies that plaintiff has performed all or any of the terms or conditions or covenants of said agreement on its part to be performed'; states the quantities of beans produced by defendant in 1919 and 1920; alleges that it 'agreed to deliver to plaintiff all of said beans . . . in accordance with the terms of said agreement . . . and would have done so, had plaintiff prior thereto and at that time kept and performed its agreement'; that 'plaintiff did not keep and perform its said agreements, as hereinafter appears.' In subsequent parts of the answer it is alleged that during the year 1918 the defendant delivered to the plaintiff, under the agreement, 11,231 bags of beans of the aggregate weight of 1,004,000 pounds; that the fair market value thereof was six cents a pound; that in November, 1918, plaintiff paid the defendant on account thereof the sum of $4,300; that no other substantial payment was made until November 29, 1920, when $22,744.73 was paid; that

'there was neither excuse nor occasion either for the delay in marketing plaintiff's beans or for the delay in reporting, accounting and paying therefor'; that 'said beans could have been sold before the bean harvest of 1919 and one year was under the then circumstances a fair and reasonable time in which to market and pay therefor'; that 'plaintiff sought to have a tariff placed by congress on beans not produced in the United States and without right or authority, expended about $15,500 to that end prior to March 31, 1920'; that 'it financed the 1919 growers out of credits from the 1918 crop and for that reason $1,262,012.90 of the proceeds of the 1918 crop were unavailale for distribution at March 31, 1920, and only $71,506.02 was available for that purpose'; that 'some directors took their own 1918 beans out of plaintiff and sold them directly and individually and not in or by the association; that one of the present directors did not deliver his 1919 crop of beans to the association; that no action has been commenced against him; that the chief officer of plaintiff sold 1918 beans and 1919 beans to private dealers direct and not through the association.' By way of set-off, counterclaim and cross-complaint, the defendant set up a claim against the plaintiff for the difference between the alleged value of its 1918 crop of beans and the amount it had received from plaintiff on account thereof. The defendant also prayed for an accounting.

"The following facts are taken from the evidence. The plaintiff was organized in the early part of 1918 and by the end of that year it had about 1500 members, who had delivered to it up to that time, under agreements essentially the same as that between the plaintiff and the defendant, about 1,000,000 sacks of beans. Due to the activities of the national food administration, the bean crop of California in 1918 'was the largest crop ever raised, almost double . . . the average crop.' Other food products were 'abnormally large.' The warehouses of the state did not have sufficient capacity to take care of all food products. In the fall of that year 'there was more rain damage than had ever been known before. . . . Heavy rains came early in September.' The bean crop was damaged by these rains. 'A large percentage of them were so badly damaged they could not be made into choice recleaned beans.' 'The grower was per-

mitted to deliver to any public warehouse that he selected.' The warehouses handled them 'just as they handled beans of other persons . . . that were delivered there.' The association endeavored 'to get for those beans the best treatment in the warehouses that was possible.' Large quantities of damaged beans were placed on the market. With the termination of war conditions, the 'government . . . went out of the market . . . and it was impossible to find any buyers who could take such a large quantity of beans. . . . The sale of a large quantity of beans for export was made impossible because of the fall in foreign exchange.' There was no speculative market. 'There was a carry-over from 1917. . . . There was such a tremendous supply of beans, which in reality took about three years to handle, that it was virtually impossible to sell any quantity of beans outside of orders to the government.' One witness testified: 'If we had offered such a tremendous quantity of beans at any time to the home trade, it would have sent the market down probably two or three cents.' The evidence clearly shows that the plaintiff made every reasonable effort to care for the beans under its control and to market them at a fair price but was unable to sell the bulk thereof until the summer of 1920.

[1] "Appellant contends that at any time during the period of six months commencing November 1, 1918, the beans could have been sold at a price higher than that which was finally received for them. If the contention be conceded, it does not follow that the plaintiff is liable for its failure to sell during the earlier period. The plaintiff was clothed with a reasonable discretion in the marketing of the beans under its control, and it is not to be held accountable for an honest mistake of judgment, if the course pursued by it was apparently warranted by conditions then existing. There is nothing in the record to show that the plaintiff did not reasonably exercise the discretion with which it was vested. It further appears that the defendant consented to the delay of which it now complains. The agreement provides: 'The grower further agrees that the association shall, if possible, dispose of the beans delivered hereunder during the season of their delivery and that they shall not be stored beyond April 1 of any year by the association for his account or otherwise, without his express

written consent.' March 10, 1919, the defendant executed and delivered to the plaintiff an instrument reading as follows: 'The undersigned . . . hereby expressly consents and hereby expressly authorizes and directs the said association to hold, . . . until further orders from us, . . . the beans heretofore delivered by him to the association beyond April 1, 1919, and to market them when, in the discretion of the management of said association, the most advantageous terms may be secured by the sale' thereof.' No further order or direction was given by the defendant.

[2] ''The plaintiff sold the bulk of the beans of 1918 during the months of June, July and August, 1920. In September of the latter year it offered to pay defendant the net proceeds of the sales of its beans upon the defendant's accounting for its crop of 1919, and on the 29th of November, 1920, plaintiff paid defendant for all the latter's beans which had been sold, without any deduction on account of defendant's failure to deliver its 1919 crop. The agreement provides: 'The association shall market and sell the beans of the grower, mingled with the beans of like variety and grade delivered by other growers named in contracts similar to this contract, at the reasonable and fair value thereof; and the grower agrees that his beans shall be so handled and mingled and that the returns therefrom, less brokerage and all other costs and charges and the association charge, as set forth in paragraph 2 hereof, shall be credited and paid to him on a proportional basis out of the amounts received by the association during the season from the sale of all such beans of each variety and grade.' It is apparent that, with fifteen hundred members and a million sacks of beans of different varieties and grades, an elaborate system of accounting was required in order to carry out the foregoing provisions of the agreement. It could not have been contemplated that the plaintiff should go to the heavy expense of making a separate distribution of the proceeds of every sale made by it, regardless of the amount thereof. Under all the circumstances, it was a question of fact for the trial court to determine whether the plaintiff unreasonably delayed accounting to defendant. In any event, such delay is not available as a defense to this action, because the defendant had breached its contract by refusing to deliver its 1919 crop of beans before the plaintiff had sold and received payment for any considerable part of the 1918 crop.

"In May, 1919, the plaintiff sold 250,000 sacks of beans but 'the final delivery and payment therefor was not made until some time in the early part of 1920. There were several smaller orders in between.' The minutes of March 27, 1920, recite that the association made certain payments to the Bank of Italy on account of money borrowed from that bank with which, apparently, to finance the bean growers of 1919, among the payments being one of '$250,000 paid on account subject to renewal. That the $250,000 so paid was borrowed temporarily from the proceeds of sales of 1918 crop. . . . That the security for said $250,000 is in the hands of the Bank of Italy, and said $250,000 will be re-borrowed from the bank when actually needed to make distributions.' The respondent contends that the proceeds of the 1918 crop were not ready for distribution at the time this money was borrowed temporarily and that the 1918 growers were the gainers by the transaction, because they were credited with interest on the money borrowed. One of the officers of the association testified: 'The directors . . . tried to be guided by good judgment in making these distributions. . . . The amount of clerical work that has to be done in charging a large amount of accounts and charges . . . made it necessary for us to go slow for a month or so in making this final distribution. I know it was done as rapidly as possible. We increased our office force at the time.' Of course, the association was without authority to use the proceeds of the 1918 crop to finance the growers of 1919, but it does not appear that the defendant was injured thereby, and, since the defendant had breached the contract prior to the unauthorized use of such money, plaintiff's misuse of the money at a subsequent time was not an excuse for the defendant's breach, if it be conceded that such temporary misuse of the money would have justified a refusal by the defendant to perform in any event.

[3] "The plaintiff expended the sum of $15,449.75 in an effort to have the tariff rates on beans increased. It appears that of this sum $9,684.35 was contributed to the association by outside interests and that the remainder of $5,765.40 was taken from the amount collected as membership fees and was not charged to the growers as an expense of marketing their beans. No attempt was made to show the particular purpose for which the money was used or

that it was illegally or improperly expended. [4] It is neither illegal nor improper to expend such reasonable sums as may appear to be necessary to present, by fair and open means, the merits of any matter advocated before a legislative body. (6 Cal. Jur. 126, and cases there cited.) It is to be presumed, in the absence of evidence to the contrary, that such means only were employed. (*Fits* v. *Marsh,* 171 Cal. 487, 488 [153 Pac. 926]; *Schweppe* v. *Sandberg,* 50 Cal. App. 507, 511 [195 Pac. 454].) The articles of incorporation provide that one of the purposes of the association is 'to do each and every thing necessary, suitable, or proper, for the accomplishment of any of its purposes or attainment of any one or more of the objects herein enumerated, or which shall at any time appear conducive to or expedient for the interests or benefit of this association, in its proper activities, and to contract accordingly.' Under such broad powers, it cannot be said that the association exceeded its authority in the proper expenditure of a reasonable sum to procure favorable tariff legislation.

[5] "Appellant complains that the court refused to permit it to prove its allegations to the effect that some of the officers and members of the association withdrew from the pool the beans which they had delivered to it in 1918, that one of the directors did not deliver his 1919 crop of beans to the association, and that the chief officer of the association sold his bean crops of 1918 and 1919 directly to dealers and not through the association. In its opening brief the appellant says: 'Of course, the fact that others breached their contracts by not delivering beans would not of itself and alone furnish excuse for defendant to breach its contract. . . . The objectionable thing is plaintiff's permitting: Delivered 1918 beans to be withdrawn for sale by the owner; its directors to violate their duties as well as contracts; and non-director member contractors to de likewise.' It is not alleged that the association or its members suffered any detriment from the alleged withdrawal of beans which had been delivered to it. Should a member withdraw his beans from the pool at a time after the association had sold the bulk of the beans under its control at higher prices than that prevailing at the time of and subsequent to such withdrawal, then, no detriment from other considerations appearing, the

other members would be the gainers thereby, because the withdrawing member would thereby lose his right to share in the distribution of the proceeds of the beans sold at the higher prices and the other members would receive a greater proportion of the proceeds of sales at the higher prices. The testimony shows that a withdrawal of beans 'was treated the same as a sale'; that is, the member who withdrew his beans was charged the same proportion of the association's expenses as those whose beans were sold by it. The offered proof was not directed to any issue raised by the answer. It is not alleged that any beans were withdrawn from the 1918 pool prior to April 1, 1919. The agreements between the association and its members provide that the beans of a grower 'shall not be stored beyond April 1 of any year by the association for his account or otherwise, without his express written consent.' The reasonable construction of this provision is that the grower had the right to withdraw any of his beans held by the association after April 1st of any year unless he consented that they be held after that date, because if the association was unable to sell the beans on or before April 1st and could not hold them thereafter its right to possession and control thereof must have terminated with that day. There is evidence to the effect that the beans held by the association could not have been sold earlier than they were sold and the court found that 'it is not true that said beans could have been sold before the bean harvest of 1919.' The allegation that one of the directors 'did not deliver his 1919 crop of beans to the association' and that 'no action has been commenced against him' does not state a ground of defense. The order in which actions may be commenced against defaulting members is immaterial. There is no allegation to the effect that the plaintiff does not intend to bring an action against such director or that it was a party to such default or in any manner consented thereto. For like reasons the allegation that 'the chief officer of plaintiff sold 1918 beans and 1919 beans to private dealers direct and not through the association' does not state a defense. Whether they were sold before or after April 1st of the respective years mentioned does not appear and it is not alleged that the plaintiff consented to their sale in the manner alleged.

"The complaint alleges that 'plaintiff has performed all of the terms, conditions and covenants of said agreement on its part to be performed.' The answer denies this allegation. If it be conceded that under the issue so raised, if nothing further in that connection appeared in the answer, the defendant would have had the right to introduce evidence of the facts which it attempted to prove, it limited such right by its subsequent specific allegations of failure to perform. [6] Where a plaintiff alleges performance of a contract on his part in general language 'the general allegation will not save the complaint where, in addition, plaintiff sets out what he has actually done, and such facts fall short of due performance.' (13 C. J. 727; *McNulty* v. *New Richmond Land Co.,* 44 Cal. App. 744, 747 [187 Pac. 97].) The same rule should apply to an answer which denies a general allegation of performance by the plaintiff and, in addition, sets out the particulars in which the plaintiff has failed to perform. In *Eucalyptus G. Assn.* v. *Orange C. N. & L. Co.,* 174 Cal. 330 [163 Pac. 45], an action for damages for breach of a contract to plant trees and care for them for a given time, the complaint alleged 'that the said plaintiff has generally and specifically complied with and performed each and all the conditions on its part to be performed and contained in said written agreement.' The answer denied this allegation in general language and alleged certain defaults of the plaintiff as an affirmative defense. It appeared from the findings of the court that, 'under the terms of the contract, . . . the plaintiff was to furnish pumping plants, including the wells, of capacity sufficient to obtain the water that would be required to enable the Nursery Company to carry out the contract. Plaintiff was also to do the leveling of the land necessary for that purpose.' Plaintiff did not properly level or grade the land nor did it install pumping plants of sufficient capacity to flood and irrigate it. The court said that such failures of performance by plaintiff 'fall within the category of excuses for nonperformance, and they are excuses not apparent on the face of the contract, nor embraced within the facts alleged in the complaint. They are, therefore, matters of defense, and to be available to the defendants they must be set up in the answer.'

[7] "In answer to the defendant's cross-complaint, which contains the same matter set up as a set-off and as a counter-claim, the plaintiff, in addition to denials of such matters, alleged and the court found that there had been an account stated between the parties and an accord and satisfaction as to the proceeds of the 1918 crop of beans. In ruling upon the admissibility of evidence in support of such alleged set-off, counterclaim and cross-complaint, the court stated that, because of such account stated and accord and satisfaction, 'the question of recoupment or question of damages by the defendant cannot be inquired into and considered in this action. . . . But for the purpose of absolving the defendant from further compliance, that is a different question. In other words, if you can show the plaintiff breached its contract so as to absolve you from further compliance with the contract, that is a complete defense, but does not entitle you to any damages. You took your money—cash— and had your settlement. That was a final settlement.'

"During the time the beans were held in storage the plaintiff from time to time sent the defendant statements of sales made and of charges debited to the defendant's account, such as insurance, cleaning and resacking beans, patching sacks, etc., and the defendant often replied with complaints that the charges were excessive. September 16, 1920, defendant wrote plaintiff, demanding a settlement and, among other things, saying: 'Your auditor's report which was submitted to us some time ago made the amazing statement that the money realized from the 1918 beans was actually used to finance the 1919 crop. This seems to us incredible. If true, the directors have made themselves personally responsible, as they undoubtedly did by refusing to sell the beans when a good price was offered early in 1919. We shall be obliged to take legal steps along these lines if a check is not promptly sent to us. We shall also take very decided exceptions to your expense accounts as they are extravagant beyond all reason. You have no right under the agreement to deduct more than $1.00 per ton for such expenses, and section 4 provides for the return of any unused portions of the $1.00 per ton.' Thereafter the plaintiff furnished the defendant with a complete statement of all receipts and disbursements in connection with the defendant's 1918 beans, showing that all of such beans, except

3500 pounds which were damaged, had been sold and that the defendant had been credited with a net balance on account of beans sold in the sum of $22,744.73. Damaged beans were not entered into the pool, as there would be no basis for the distribution of the proceeds thereof among the growers, the selling price thereof depending upon the extent of the damage thereto, but they were sold separately and the net proceeds thereof credited to the individual growers. November 29, 1920, the plaintiff sent the defendant a check for $22,744.73, enclosed with a letter reading as follows: 'We have pleasure in enclosing herewith our check No. 2525 for $22,744.73 representing a final settlement of the 1918 account with the exception of two small lots which remain unsold, these were enumerated on a statement which we recently forwarded to you.' On the following day the defendant acknowledged receipt of the check in a letter reading as follows: 'We are in receipt of your letter of November 29th, enclosing your check No. 3536 for $22,744.73.' February 24, 1921, plaintiff wrote defendant, enclosing statement of sale of the damaged beans and a check for the net proceeds thereof, amounting to $66.51, and saying: 'This amount represents the final settlement on your 1918 account.' The defendant cashed the first check November 30, 1920, and the second one February 26, 1921. The record does not show that the defendant made any objection to the settlement until its answer was filed herein August 18, 1921.

"The foregoing evidence is sufficient to support the finding of the court to the effect that there was an account stated between the parties and an accord and satisfaction. (*Berger* v. *Lane*, 190 Cal. 443, 447 [213 Pac. 45]; *Lapp-Gifford Co.* v. *Muscoy Water Co.*, 166 Cal. 25, 27 [134 Pac. 989]; *Creighton* v. *Gregory*, 142 Cal. 34, 39 [75 Pac. 569]; *Schneider* v. *Oakman Con. Min. Co.*, 38 Cal. App. 338, 342 [176 Pac. 177]; *Johnston* v. *Burnett*, 17 Cal. App. 497 [34 A. L. R. 1036, 120 Pac. 436].) The fact that the relation of principal and agent existed between the parties does not change the rule. [8] 'When the agent has rendered an account to his principal, it is open to the latter to object either to the fullness or the accuracy of the account; or, on the other hand, to agree to it as a full and accurate account of the agent's transactions. If he expressly agrees to it,

the account will then have ordinarily all the characteristics of an account stated. But it is not necessary that the principal's acquiescence shall be express; it may be implied from the facts and circumstances as in other cases. The essential thing is, that the facts and circumstances relied upon, as constituting acquiescence, must be such as reasonably lead to the inference that the principal assents to the account as correct. If an agent . . . renders to his principal an account of his transactions, the principal must, in general, if he would object to it, do so within a reasonable time, and if he does not, the agent is justified in treating the principal's silence as an admission by the principal "that the account as rendered was just and true and that he was willing to be bound by it." ' (Mechem on Agency, 2d ed., sec. 1351; *Crane* v. *Stansburg,* 173 Cal. 631 [161 Pac. 7]; *Johnston* v. *Burnett, supra.*) The fact that the relation of principal and agent exists between the parties, of course, is to be considered in weighing the evidence to determine whether there has been an account stated or an accord and satisfaction. (Mechem on Agency, 2d ed., sec. 1352.) That fact was given weight in *Egan* v. *Crowther* (Cal. App.) [241 Pac. 900, 902].

"The fourth paragraph of the agreement provides: 'The association charge shall be used for meeting the expenses of the association. If, at the end of the year's operations any surplus remains out of the said charge, the association may use the same for any purpose of common advantage or profit to the growers or may refund the surplus, or any portion thereof, to the growers, in proportion to their shipments to or through the association.' It does not appear whether there was any such surplus from the 1918 beans. If so, it was one of the matters in dispute between the parties. In defendant's letter of September 16, 1920, it said: 'You have no right under the agreement to deduct more than $1.00 per ton for such expenses, and section 4 provides for the return of any unused portions of the $1.00 per ton.' It must be presumed, therefore, that the settlement disposed of that controversy. The payments of November 29, 1920, and February 24, 1921, were made expressly as 'a final settlement of the 1918 account' and it must be presumed that the settlement included all credits to which the defendant was entitled. The stated account and the accord and

satisfaction are not attacked on the ground of fraud or mistake in the procurement thereof.

[9] ''The contentions that the agreements between the association and its members create an unlawful trust or combination in restraint of trade and that the stipulation in the agreement for liquidated damages is invalid are sufficiently answered, contrary to appellant's contentions, in the decisions first cited in this opinion. The clause providing for liquidated damages recites that 'it is now and ever will be impracticable and extremely difficult to determine the actual damage resulting to the association should the grower fail to consign and deliver his beans.' The complaint alleges and the court found to the same effect. From the nature of the association and its agreements with its members it is apparent that it would be impracticable or extremely difficult to fix the actual damage resulting from such a breach of the agreement by a member. The agreement contemplates that the association may sell the beans of a grower prior to the delivery thereof to the association. It provides: 'The grower agrees to ship directly to any person under contract with the association such percentage of his shipments as the association may direct, packed as the association may instruct.' If growers refuse to deliver their beans to the association, it may find it impossible to fulfill its own contracts for the sale of beans and thereby become liable in damages to the buyers thereof. If large quantities of beans are withheld by the growers and sold directly by them, the market for beans may be undermined to the detriment of all members of the association. Such conduct on the part of the growers may well imperil the very life of the association or destroy it and defeat the purposes for which it is organized. .

[10] ''The by-laws of the association provide: 'If any member shall cease, fail, neglect or refuse for any reason whatsoever to market all or any of the beans grown or owned by him as provided by the said crop sale agreement, then his membership shall *ipso facto* cease and determine and his certificate and his membership in this association and all of his rights and interest therein shall by that act be automatically cancelled and such member shall not, nor shall anyone in his behalf, be entitled to any appraisement or share in the property or good will of the association.'

The question arises whether, upon defendant's refusal to deliver its beans of 1919, it ceased to be a member and, if so, whether it was thereby released from its agreement to deliver its beans of 1920. The association took no steps to cancel defendant's membership but insisted that the defendant was under obligation to deliver its crops of 1919 and 1920 under the terms of the agreement. In *Central Oil Co.* v. *Southern Refining Co.*, 154 Cal. 165 [97 Pac. 177], there was involved a contract for the sale by the plaintiff to the defendant of not less than 5,000 barrels of oil a month for a period of one year. The agreement provided: 'The violation of any of the terms or conditions thereof by either party hereto shall work a forfeiture thereof, and this agreement shall thereupon become void and of no effect.' The defendant took oil as provided by the contract for a time and then refused to take any oil during the remainder of the year. Plaintiff thereupon sued for damages consisting of lost profits for the remaining months of the year. Plaintiff was given judgment and the defendant appealed. The court said: 'Appellant's first and principal contention is that by force of the terms of the contract itself, when defendant violated it, the agreement became "void and of no effect"; that this provision means that the violation terminated the contract and that consequently plaintiff had no right of recovery under it. Clearly appellant misconstrues the force of the language upon which it relies. That language means that by a violation of the terms of the contract the rights of the party violating it cease, and ·as to that party and to that extent, the agreement becomes void and of no effect. It would be an extraordinarily unreasonable construction to give the language the meaning for which appellant contends.' That case is decisive of the question here under discussion.

[11] ''Appellant contends that the judgment is erroneous in that it allows interest upon the amounts awarded as liquidated damages from the respective dates upon which the defendant refused to deliver his crops of 1919 and 1920. Such amounts were capable of being made certain by mere calculation and interest thereon, therefore, was properly allowed. (Civ. Code, sec. 3287.)

"A careful examination of the voluminous record does not disclose any error to the prejudice of appellant's rights."

The judgment is affirmed.