NEBRASKA WHEAT GROWERS ASSOCIATION, APPELLANT, V. ROY C. SMITH ET AL., APPELLEES.

FILED JANUARY 13, 1927. No. 25516.

1. **Findings Approved.** Certain findings of fact and of law made by district court set out in opinion and approved.

2. **Contracts:** SEPARATE INSTRUMENTS. The general rule is that, in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for

the same purpose, when in course of the same transaction, are, in the eyes of the law, one instrument, and will be read and construed together as if they were as much one in form as they are in substance.

3. Agriculture: MARKETING AGREEMENT. Contracts in suit set out construed to embrace articles of incorporation, by-laws, and standard marketing agreement; and that the object and purpose of the transaction set forth therein was the conferring on the defendant membership in the corporate body referred to in the contract and defining the rights and duties arising by reason of the relation thus created.

4. ———: ———: CONSTRUCTION. Whether the breach of the contract, as alleged by the defendant, is so material as to justify the injured party in refusing to proceed further, and suing for rescission of or for damages for breach of the entire contract, or whether the breach is severable giving rise to a claim of compensation, but not to a right to treat the whole contract as broken, must be determined by the terms of the contract as above defined and the circumstances of the case.

5. Contracts: BREACH: RESCISSION. "Not every breach of a contract by one party thereto will authorize the other to treat it as rescinded. The failure to perform an independent stipulation collateral to the main consideration, not amounting to a condition precedent, and not such as to prevent the performance by the party so in default, of the principal undertaking, although attended by some loss or inconvenience to the other party, does not absolve the latter from liability, or authorize him to treat the contract as abandoned." *American Building & Loan Ass'n v. Rainbolt*, 48 Neb. 434.

6. Corporations: SELECTION OF OFFICERS. It is the duty of the members of a corporation to select competent officers to direct the corporate affairs, and, failing to do so, they will not be heard to complain if those chosen for that purpose prove to be incompetent or inattentive to the trust reposed in them.

7. ———: MISMANAGEMENT: RIGHT OF WITHDRAWAL. The mere mismanagement of the affairs of a corporation by its officers or agents does not warrant the withdrawal therefrom of its members or the repudiation of obligations assumed by them as such.

8. Agriculture: MARKETING CORPORATION: SALE OF PRODUCTS. The managing officers of this corporaton, subject to the control and direction of its membership, to be exercised as provided for in articles of incorporation, by-laws, and standard marketing

Nebraska Wheat Growers Ass'n v. Smith.

agreement, possessed, under the terms of this contract, the right and power to sell the products of its membership delivered to the corporation for that purpose to the best advantage in view of the circumstances which confronted it, and they were not, by the terms of the contract, precluded from selling the same by or through the ordinary agencies of the public market in the usual course of trade, when such course was by them in good faith deemed advisable.

9. **Damages.** Evidence examined, and it appearing that it would be impracticable and extremely difficult to fix the actual damages resulting from a breach of the contract pertaining to the sale and delivery to such corporation of the products by its membership as required by the terms of said agreement, and it further appearing that the amount of damages stipulated in the contract is not, in view of the facts of the record, disproportionate to the probable damages, the provisions for liquidated damages therein contained are hereby approved and sustained as valid.

APPEAL from the district court for Deuel county: J. LEONARD TEWELL, JUDGE. *Reversed, with directions.*

*Corcoran & Sprague,* for appellant.

*Halligan, Beatty & Halligan* and *L. O. Pfeiffer, contra.*

Heard before ROSE, DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

EBERLY, J.

This is an action for specific performance of a cooperative agreement, commonly known as the "standard marketing agreement," entered into between plaintiff and defendants as members of the plaintiff association in 1923, covering the years 1924, 1925, 1926, 1927, and 1928. By the terms of this writing the plaintiff agrees to buy, and the grower (defendant) agrees to sell and deliver to the association all the wheat produced by or for him, or acquired by or for him as landlord, or lessor, during the years mentioned. The wheat of each year was to be pooled and be sold by the plaintiff in accordance with the terms of the contract, and the proceeds, after deduction of certain ex-

penses as charges, was to be shared by the producers of the wheat, constituting the pool of that year, in proportion to the amount contributed by each. The prayer of the petition before us, in substance, is that the defendants be enjoined from selling any portion of their wheat grown in 1925, except as provided by the terms of the contract in suit, and also for an accounting of the amount of the 1925 crop sold by the defendants to persons other than the plaintiff, and the recovery as liquidated damages in the sum of 25 cents a bushel for the amount so sold. The form in which the action was brought was approved by this court in *Nebraska Wheat Growers Ass'n v. Norquest,* 113 Neb. 731.

Two cases are consolidated by stipulation of the parties. The defendants admit by their pleadings the refusal to sell and deliver the wheat in controversy, and plead fraud in the inception of the contract which they allege nullified their obligations, and also certain facts occurring after execution of the contract which were alleged to be a breach of the same by the plaintiff and to release the defendants from further performance of the terms thereof. They also contest the right of plaintiff to liquidated damages. In addition to this answer, the defendants, by cross-petition, sought to have the contract in suit wholly rescinded and their membership in the plaintiff association terminated. Replies were filed. The trial court, after hearing the evidence, denied specific performance and dismissed the action, from which judgment the plaintiff appeals.

The plaintiff herein is the same, and the terms of the standard marketing agreement, which appear attached to plaintiff's petition as a part thereof, as well as the demand for relief, are substantially identical with the terms of the contract and pleadings before the court in *Nebraska Wheat Growers Ass'n v. Norquest, supra.* The plan of this association contemplated the creation of certain pools of wheat grown each year during the continuance of the agreement by the members of the association. The wheat of the pool was to be sold as provided by the terms of the con-

tract before us.  Each of these pool years was a distinct unconnected transaction, the results of which spell success or failure for the twelve months involved to the parties concerned in said pool, but in no manner affect the results of the other pools contemplated or carried out.

The district court made certain special findings as part of the judgment entered.  From these the defendants have prosecuted no appeal.  After a careful examination of the record, as well as the authorities cited by counsel in their respective briefs, the following findings of the district court are by us adopted and approved, viz.:  "That no fraud existed in the inception of the contract set forth in plaintiff's petition, and that said contract, when the same was entered into between the said plaintiff and the defendants, was a binding contract of which a court of equity would compel specific performance. * * * That as a matter of law failure of the other members of said plaintiff's association other than the defendants herein to perform like contracts is, in fact, no excuse for either the plaintiff's or the defendants' failure to perform the contract according to its intention as set forth in said petition."  Without determining whether the defendants received less for their 1924 crop as a result of the 1924 pool than they would have received by selling the same to persons other than the plaintiff, this court finds that if the said defendants did receive less for their 1924 crop than they would have received by selling the same to persons other than the plaintiff, the fact is wholly "immaterial and furnishes no excuse to defendants for failure to perform the contract as set forth in the petition of the said plaintiff."

The defendants, Smith and Schutte, base their defense upon an alleged rescission of the written instruments attached to plaintiff's petition, justified by certain alleged defaults of the plaintiff during the pool year 1924.  And, as a matter of fact, both concede that they, individually, breached the standard marketing agreement during the pool year, one, by selling 514 bushels of wheat in violation of its terms, and the other, in a similar manner by selling

96 bushels of wheat grown in 1924. 2 Williston, Sales (2d ed.) 1205, sec. 467g. Both also executed and caused to be served upon the plaintiff a notice of rescission of the contracts in suit and of their memberships in plaintiff association.

The rights of the defendants to rescind and as to defense must therefore be sustained, if at all, wholly by the events and happenings and the business transactions of the 1924 pool year. Any breaches of the marketing agreement by the plaintiff association or of the contract of membership, if such there were in the 1925 pool year, would not be available to the defendants as an excuse or justification for the action which they took. *California Bean Growers Ass'n v. Rindge Land & Navigation Co.*, 199 Cal. 168.

It would seem from an analysis of the pleadings, evidence, and briefs, that the fundamental principles on which the defendants rest their contention include the proposition that the "standard marketing agreement" in evidence here measures the rights of the parties to this lawsuit, are exclusive and are wholly unaffected by any duty or obligation resting upon the defendants by reason of membership in plaintiff association, and that it is to be regarded as an "entire," as distinguished from a "severable" or a "divisible," contract. In other words, it is to be considered as embracing a single object; one in which the parties thereto intend that each covenant shall be connected with every other covenant therein contained or connected therewith. And therefore the violation by one party to an "entire" contract of one of the several parts or divisions of his contract would operate to release the others wholly from further performance thereunder.

True, the transactions here presented contemplate that the wheat growers each year under these agreements shall, together with the other wheat growers of that year (parties who have executed similar contracts), constitute a separate, distinct, and unconnected pool of wheat to be marketed over a period of twelve months as an entire and complete trans-

action, and that the proceeds of·such disposition, less contract charges, should be divided between the wheat growers contributing such pool, in proportion to the amount furnished by each.  Thus, there was a complete apportionment of the net proceeds of each pool to the wheat growers furnishing the wheat embraced in the same as the complete purchase price thereof.  Though the fact that the consideration is apportioned, by the parties, among different covenants, is generally sufficient to show, in absence of other provisions in a contract indicating a contrary intention, that the different covenants form severable contracts *(Wilcox v. Badger Motor Car Co.,* 99 Neb. 189), we assume for the purpose of this case only that we are dealing with an "entire" contract.  5 Page, Law of·Contracts (2d ed.) sec. 3002.

It would also seem that it must be conceded that if, under the circumstances of the instant case, such arrangements constituted an "entire" contract, it must also be admitted that it must be regarded as a contract to deliver by stated instalments.  It would necessarily follow that the delivery of wheat for each pool year and its payment made as provided by the "standard marketing agreement" would be, in truth, a delivery and payment of an instalment thereunder.

It is conceded by the record that the plaintiff properly accounted to the defendants for the amount of all wheat delivered by them to the 1924 pool, and as purchase price out of the proceeds·of said pool paid to the defendants approximately $1 a bushel.  Defendants, however, contend that such payment was insufficient, and because its insufficiency was due to certain alleged violations of contracts in the manner of handling the wheat sold, plaintiff thereby breached the contract.  They assert as to the first instalment, the 1924 pool, the plaintiff breached the contract by failing to properly "store," "mix" and "process" the same, and sold the wheat as fast as received through the ordinary channels by employment of paid agents, and did not sell

the same itself directly to miller, exporter, or other primary consumers of wheat as contemplated by the agreement, and that in addition thereto the charges and deductions made by plaintiff were excessive and unjustified by the terms of the agreement in question.

Conceding, for the purpose of consideration only, that the defendants' contentions as to these facts are supported by the record, are they entitled to the relief granted by the decree appealed from which, in effect, 'if not in form, amounts to a rescission of the contract in its entirety, At most, the facts complained of by the defendants amount to a partial default in the payment of the purchase price for the 1924 instalment of wheat. Even so, it must also be conceded that the defendants themselves breached the same contract by failure to make the delivery required thereby prior to the ultimate breach by the plaintiff herein, for the defendants failed to deliver a portion of the 1924 wheat as required by the terms of the contract, thus contributing to the default upon which they base their right of rescission.

It is true this court has held that, where a contract of sale provides for delivery in instalments and for the payment of any instalment as delivered, or within a stated time thereafter, the refusal or neglect of the buyer to make payment of each or any instalment is such a breach of the contract as to entitle the seller to rescind it as an entirety. *Spiegal & Son v. Alpirn,* 107 Neb. 233. In this case just cited there was no prior or contemporaneous default on the part of the plaintiff. And it must be remembered that it was determined November 26, 1921. It was based upon and involved a contract of sale dated June 29, 1917. Our uniform sales act was passed in 1921, and became effective in July of that year. In express words it provided: "None of the provisions of this act shall apply to any sale, or to any contract to sell, made prior to the taking effect of this act." Comp. St. 1922, sec. 2546.

Our uniform sales act was, in truth, the adoption by our legislature, with certain minor modifications, of the

"Sale of Goods" act as passed by the British parliament on February 20, 1894. The latter was an act to codify the law relating to the sales of goods in that nation.

In this connection, in 1884, the House of Lords determined an appeal in the case of *Mersey Steel & Iron Co. v. Naylor, Benzon & Co.,* 9 Law Rep. App. Cas. (Eng.) 434. In this action there was presented a case where, under a contract for sale, the Mersey company had bought of the Naylor company 5,000 tons of steel, company's make, to be delivered 1,000 tons monthly, commencing January, 1881, payment to be within three days after shipping documents were received. On February 2, 1881, because of error, but in good faith, the Naylor company refused to pay for the instalment delivered. The Mersey company elected to consider it a breach of contract which released them from further liability on the contract of sale. This conclusion, it will be noted, is in strict accord with the doctrine of *Spiegal & Son v. Alpirn, supra.* However, the court of appeals of England determined to the contrary, and held that such a breach did not operate to terminate the contract, nor in any manner impair its enforcement by the defaulting parties. This view was sustained by the House of Lords. In substance the holding in this *Mersey Company* case was that payment for a previous delivery was not a condition precedent to the right to claim the next delivery. Nor did the default terminate the contract as an entirety, and that, under the circumstances of that case, the party injured by the default was relegated to his action for damages. The gist of that decision appears in the "Sale of Goods" act, Statutes 1893 (Eng.) in possibly a somewhat qualified form in the following language: (1) Unless otherwise agreed, the buyer of goods is not bound to accept delivery thereof by instalments. (2) Where there is a contract for the sale of goods to be delivered by stated instalments, which are to be separately paid for, and the seller makes defective deliveries in respect of one or more instalments, or the buyer neglects or

refuses to take delivery of or pay for one or more instalments, it is a question in each case depending on the terms of the contract and the circumstances of the case, whether the breach of contract is a repudiation of the whole contract or whether it is a severable breach giving rise to a claim for compensation, but not to a right to treat the whole contract as repudiated.

In connection with the *Mersey Company* case cited, the Earl of Selborne, L. C., in his opinion, makes use of the following language: "It is perfectly clear that no particular payment can be a condition precedent of the entire contract, because the delivery under the contract was most certainly to precede payment; and that being so, I do not see how, without express words, it can possibly be made a condition precedent to the subsequent fulfilment of the unfulfilled part of the contract, by the delivery of the undelivered steel." *Mersey Steel & Iron Co. v. Naylor, Benzon & Co., supra.*

It must be conceded, however, that the doctrine of the *Mersey Company* case did not receive a favorable reception from the judiciary of this nation. The great overwhelming weight of authority on this side of the Atlantic was in accord with the doctrine announced by our own case of *Spiegal & Son v. Alpirn, supra,* and *Norrington v. Wright,* 115 U. S. 188. However, in our uniform sales act, our legislature substantially adopted in qualified form the doctrine announced in the *Mersey Company* case which our American judiciary had but with few exceptions repudiated. In the section of that act, section 2514, Comp. St. 1922, corresponding to section 31 of the "Sale of Goods" act of England, 1893, we find almost the exact language employed, the sole difference being that for the words, "whether the breach of contract is a repudiation of the whole contract," found in the English statute, there are substituted, "whether the breach of contract is so material as to justify the injured party in refusing to proceed further and suing for damages for breach of the entire contract." The result of this legislative action is that the statutory rule has changed the

current judicial pronouncement, and that now a total default in payment of an instalment does not *ipso facto* at the election of the injured party terminate a contract of sale, but that its legal effect depends "on the terms of the contract under the circumstances of the case."

It may also be said that, while the words substituted in the Nebraska statute may not be deemed the exact equivalent of the language of the English act whose place they supply, still at most the difference in the test adopted, if any, is that we now weigh the effect of the default, and adjust the rigor of the remedy to the gravity of the wrong. *Helgar Corporation v. Warner's Features,* 222 N. Y. 449.

The "terms of the contracts" before us in this case are in writing, and each comprises a written offer followed by a written acceptance. They are substantially identical and the language of one will serve for both. They are as follows:

"Application for Membership.

"The undersigned wheat grower hereby applies for membership in The Nebraska Wheat Growers Association.

"The undersigned states that he has read the articles of incorporation, by-laws, original association agreement, and standard marketing agreement of the association; and that he understands and approves them and accepts them as binding upon him in all their terms.

"The undersigned agrees to perform all of the obligations of the by-laws and marketing agreement. (Here follow date, place and signature.)

"Accepted at Hastings, Nebraska, 8/11/1924.

"The Nebraska Wheat Growers Association, by O. P. Heald, Secretary-Treasurer.

"The following attached contract, approved and accepted by the association by authority of an express resolution of the board of directors, dated at Hastings, Nebraska, this 11th day of August, 192—: (Here follows at length a copy of the standard marketing agreement referred to above.)"

The "articles of incorporation," "by-laws," and at least

the "standard marketing agreement," are thus included in the controlling contract by direct reference.

"The general rule is that, in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in course of the same transaction, are, in the eye of the law, one instrument, and will be read and construed together as if they were as much one in form as they are in substance." *Thompson v. Jost,* 108 Neb. 778. See, also, *Nebraska Hardware Co. v. Humphrey Hardware Co.,* 81 Neb. 693; *Tate v. Kloke,* 93 Neb. 382.

Thus construed, the object and purpose of the present transaction was the conferring of plaintiff's membership in the corporate body referred to in the contract and defining the rights and duties arising by reason of the relations thus created. The terms of the contract thus construed and the circumstances of the case must determine the fact of default, and if such appears the effect thereof.

It is admitted by the pleadings that the plaintiff is a Kansas corporation, and it appears that it was formed under the cooperative marketing laws of that state. And this court has determined that it was properly doing business in this state. It may be noted in passing that the statutory provisions relating to cooperative marketing appears as chapter 17, art. XVI, Rev. St. of Kansas, 1923. Among its provisions are: That twenty or more persons engaged in the production of agricultural products may form a nonprofit, cooperative association with or without capital stock; that such association may be organized and engaged in any activity connected with the marketing or selling of the agricultural products of its members, or with processing, filling, storing, handling, shipping, or the utilization thereof; that these organizations must, by two-thirds vote of its membership, adopt by-laws for its management "not inconsistent with the powers granted by this act;" that regular meetings shall be held annually; that special meetings may be called at any time by the board of directors, and are required to be called at any time

Nebraska Wheat Growers Ass'n v. Smith.

10 per cent. of the stockholders file petition stating specific business to be brought before the association, of which special meeting previous notice shall be given to all stockholders; that management of corporation affairs shall be by a board of directors elected from the membership thereof; that directors are to be subject to removal at any time by the membership with procedure of such removal specified; that additional safeguards providing that, upon the demand of one-third of entire board of directors, any matter which has been approved and passed upon by such board shall be referred to the entire membership for final determination; that these associations are especially empowered to become a member of any corporation or organization engaged in storing or handling grain, or marketing agricultural products at terminal markets to the extent of one-twentieth of the stock of such corporation or organization.

In 1925 the further act was passed (Laws of Kansas 1925, ch. 6) and by its terms "lawfully formed and conducted cooperative associations of producers" were assured the full exercise of right to engage in the cash grain business without limitation in the same manner and upon like terms and conditions then imposed upon others in such business.

The statutes under which plaintiff was organized, it may be said in passing, are but another evidence of that change in public policy in regard to combinations of farmers for the purpose of marketing their products which has not only been universally accepted but is an accomplished fact. This is to be seen, not only by the Clayton act and the many other recent acts of congress treating farmers as a distinct class, but also appears in the regulations of the executive department of the federal government. The legislatures of more than 30 of our states, including our own, have enacted substantially similar legislation to the Kansas act before us. These evidences of uniform opinion disclose that by universal consent it is now conceded that the basic economic

condition of agriculture at the present time requires the remedies contained in the acts referred to, and that their application is deemed reasonable and just, and to operate for the good of the entire nation and every citizen thereof. *Tobacco Growers Cooperative Ass'n v. Jones,* 185 N. Car. 265. Therefore, the Kansas statute above referred to and the proceedings authorized thereby are remedial in their nature, and this court is warranted in giving the statute a liberal and effective construction. *Buckmaster v. McElroy,* 20 Neb. 557; *McIntosh v. Johnson,* 51 Neb. 33.

Then, too, it is obvious that the public policy announced has for its aim the advancement of the agricultural classes by promoting self help which, in turn, must be wholly based upon the sanctity of contracts and the integrity of engagements, not only as between cooperative corporations and third parties, but as between the membership thereof.

A corporation may be said to be an artificial person created by or under legislative enactment. The constating act under which the plaintiff was organized contains two possible forms, "stock" and "nonstock." Plaintiff is a nonstock corporation.

In a stock corporation, membership is created and the corporation sustained by the purchase or ownership of stock which evidence the right the owner has in the management, profit, and ultimate assets of the corporation, and from the proceeds of which, received by the corporation, its business may be transacted. In a nonstock corporation, the right which a member has in its management, profit, and ultimate assets is evidenced ordinarily by its contract of membership. But both stock and nonstock forms of corporation activity are created on the foundation of a contribution of money or property by its membership to be used by and through these "artificial persons" in the transaction of business for which they are organized for common profit by and of the owners thereof.

It would seem to necessarily follow that the question of the legal enforcibility involved in the agreement of a stockholder to furnish money or property through the device of

a stock subscription, and the same question arising by a corporate member in a like agreement to furnish property or money for the use of the corporate party by the device of a contract of membership, entails the application of identical principles.

Referring to the claims of defendants on which they base their defense, it is to be noted that at most the default alleged constitutes "mismanagement of the affairs of the corporation" in violation of the stipulation of what constitutes a part of their membership contract.

In the case of *American Building & Loan Ass'n v. Rainbolt*, 48 Neb. 434, 448, a similar contention between members of a "stock company" was before this court. The association, a Minnesota corporation, secured subscriptions for building and loan stock in Nebraska, it was alleged, pursuant to a contract by the terms of which it was agreed on behalf of the association that all money paid by the subscribers for their stock in the city of Norfolk and certain contiguous territory, after the payment of necessary expenses, should be formed into a "loan fund" which should be applied exclusively in payment of the stock of such subscribers, and that the business of loaning the funds of the association in Norfolk and vicinity should be carried on under the approval of a local board at Norfolk, Nebraska, to be made up from such Nebraska subscribers. This alleged agreement the association finally repudiated. And in passing upon an action brought to abrogate these subscriptions for the stock and to recover the money paid to the corporation, this court, on the theory that such a contract, in fact, existed, said: "Another fatal objection to the right of rescission in this case is that the abolition of the local board, like the alleged failure to transfer surplus money to the loan fund, amounts to no more than a mismanagement of the affairs of the association. It is the duty of the members to select competent officers to conduct the corporate affairs, and, failing to do so, they will not be heard to complain if those chosen for that purpose prove incompe-

tent or inattentive to the trust reposed in them." Syllabus: "The mere mismanagement of the affairs of a corporation by its officers or agents does not warrant the withdrawal therefrom of stockholders or the repudiation of the obligations assumed by them as such." See, also, Cook, Corporations (8th ed.) sec. 188.

The conclusion therefore is that, assuming, but not deciding, that as to plaintiff's claimed defaults, the record sustains the defendants, still, "in view of the contract and the circumstances of the case," "the breach of the contract" is "not" so material as to justify the injured party in refusing to proceed further. Plaintiff was entitled to the specific performance of the contracts in suit, and, in the denial of the injunction prayed for, the district court erred. *Pittman v. Tobacco Growers Cooperative Ass'n*, 187 N. Car. 340; *Washington Cooperative Egg & Poultry Ass'n v. Taylor*, 122 Wash. 466; *California Prune & Apricot Growers Ass'n v. Baker*, 246 Pac. (Cal. App.) 1081; *Tobacco Growers Cooperative Ass'n v. Jones, supra; Arkansas Cotton Growers Cooperative Ass'n v. Brown*, 168 Ark. 504.

Nor do we find, in view of the evidence in the record, that there has been in fact a violation of the contract by the plaintiff that would sustain or give rise to a just claim of compensation in behalf of the defendants. The controlling rule of construction already announced precludes the application of the doctrine of *ejusdem generis* contended for by the defendants. Indeed, the terms of the contract as a whole, as that word has been defined herein, particularly in the light of public policy involved, plainly indicates that it was the intent of the parties to employ the language contained in the writings in a general and not in a restricted sense. 13 C. J. 537, sec. 501. Therefore, even though one year after we determined certain transactions ill-advised, we could not say that the error in judgment was in excess of the discretion conferred or power possessed. It is deemed that managing officers of this corporation, subject to the control and the direction of its membership, to be exercised as heretofore indicated, possessed

the right and power to sell its products to the best advantage in view of the circumstances which confronted them, and that they were not precluded from selling the same by or through the ordinary agencies of the public market in the usual course of trade.   If they erred in judgment, it may be said the good faith of their transactions is not impeached by the evidence in the record.   The error is one, therefore, if mistake there was, which imposes no liability upon the corporation as such.

The plaintiff asks for a judgment for liquidated damages in the sum of 25 cents a bushel for each bushel of wheat which the defendants should have delivered.   This amount is stipulated in the contracts, and liquidated damages are authorized by the terms of the Kansas act under which the plaintiff was organized.   Chapter 80, Laws 1925, recognizes the necessity of such provisions under the circumstances of the case before us.

From the nature of the association and its agreements with its members, it is apparent that it would be impracticable and extremely difficult to fix the actual damages resulting from such a breach of agreement by its members. It does not appear, in view of the amount of damages stipulated and the facts of the record, that the damages are disproportionate to the probable damages.   It is therefore sustained as valid.   *California Bean Growers Ass'n v. Rindge Land & Navigation Co.,* 199 Cal. 168; *Edgar v. Anthes,* 109 Neb. 546; *Lorius v. Abbott,* 49 Neb. 214.

The judgment of the district court is therefore reversed and the cause remanded, with directions that the district court proceed in accordance with this opinion to determine the amount of wheat grown in 1925 and covered by the contracts in suit still in possession of either defendant, and that as to such grain judgment be entered against the defaulting party as prayed in plaintiff's petition; and that the district court further determine the amount of said wheat of 1925 crop disposed of by either of said defendants in violation of the aforesaid contracts, and to

the extent of his defaults judgment be entered against each
of the parties violating said contracts for liquidated dam-
ages provided for in said agreements in suit.

REVERSED.

