No. 36,937

THE STATE OF KANSAS, ex rel. EDWARD F. ARN, Attorney General of the State of Kansas, *Plaintiff*, v. CONSUMERS COOPERATIVE ASSOCIATION, and the STATE CORPORATION COMMISSION, etc., *Defendants*.

(183 P. 2d 423)

Opinion filed July 12, 1947.

*Edward F. Arn,* attorney general, argued the cause, and *Clay C. Carper, Harold R. Fatzer, C. H. Hobart, L. P. Brooks* and *William Timmerman,* assistant attorneys general, were with him on the briefs for the plaintiff.

*E. H. Hatcher,* of Topeka, argued the cause for the Consumers Coöperative Association, and *F. R. Olmsted,* of Kansas City, Mo., was with him on the briefs for defendant Consumers Coöperative Association.

*Jay Kyle,* general counsel, argued the cause for the State Corporation Commission, and *Howard M. Immel,* assistant general counsel, and *Louis R. Gates,* special counsel, were with him on the briefs for defendant State Corporation Commission.

*Hal E. Harlan, A. M. Johnston,* both of Manhattan, and *A. Landru Jensen,* of Salt Lake City, Utah, representing the Kansas State Grange, the Farm Bureau of Kansas and the Farmers Union of Kansas, as members of the Committee of Kansas Farm Organizations; *Barton E. Griffith,* of Topeka, and *Ernest L. Wilkinson, Woodruff J. Deem,* both of Washington, D. C., representing the National Council of Farmers Coöperatives; *Eugene L. Hensel,* of Columbus, Ohio, *Rolla W. Coleman,* of Mission, representing the National Association of Coöperatives, as *amici curiae.*

The opinion of the court was delivered by

SMITH, J.: This is an original proceeding in quo warranto brought by the state on the relation of the attorney general asking that the defendant, The Consumers Coöperative Association, be dissolved and its charter be forfeited and that a receiver be appointed. The state corporation commission was also made a party defendant at its request. The defendant, The Consumers Coöperative Association, filed an answer to which the state filed a reply. The corporation commission filed an answer and cross petition in which it asked for the determination of certain questions and for a declaratory judgment as to its power and authority and jurisdiction over certain securities issued by defendant, The Consumers Coöperative Association. The state and The Consumers Coöperative Association also entered into an agreed statement of facts. The entire matter has been submitted for final adjudication.

This original proceeding in quo warranto and a companion proceeding in mandamus filed by the defendant association in this case against the state charter board were the culmination of considerable agitation before at least the last two sessions of the legislature. The complaints seemed to center in the main about the fact that the coöperative societies were engaged in general business activities and did not have the tax burden borne by ordinary business.

For the benefit of all concerned, it must be stated at the outset of this opinion that the question of taxes is not in this case. The question to be decided in this case is solely a question of the power of the defendant coöperative society. The decision on that question turns upon the construction to be given two articles of chapter 17 of the Statutes of 1935. One is article 15. This statute is denominated "Coöperative Societies" in the General Statutes of 1935. It covers G. S. 1935, 17-1501 to 17-1515. The other is article 16 of chapter 17. This is denominated "Coöperative Marketing" in the

General Statutes of 1935. It covers G. S. 1935, 17-1601 to 17-1631. In the pleadings and briefs of this case reference is sometimes made to the statute as article 15 or article 16 of chapter 17 and sometimes by the section numbers. It will be helpful to note that in cases where the latter designation begins with 15 the section is a part of article 15 and refers to coöperative societies, while in cases where the designation begins with 16 the section is part of article 16 and refers to coöperative marketing.

After the formal allegations, the petition alleged that the defendant, The Consumers Coöperative Association, which will be hereafter referred to as CCA, was a Kansas corporation and originally organized under G. S. 1935, ch. 17, art. 15, and was originally chartered with purposes as follows:

"To deal in, handle and distribute petroleum and various products, and by-products, thereof; also such commodities as are essential and necessary in the operation of the business of this association; to purchase, lease, build, construct, maintain and operate warehouses, filling stations, pumping plants, compounding plants, refineries, and all other appliances, and conveniences for use in connection with the manufacture, purchase and sale of gasoline, petroleum, lubricating oils, and all other petroleum and oil products; hold, lease, mortgage, encumber, sell, exchange and convey real estate and personal property as the business of the association may require; and it shall have the power and authority, either for itself or its individual members and patrons, to do and perform every act and thing necessary and proper to the conduct of the business of this association permitted by the act under which this association is organized."

The petition alleged further that this charter was amended in 1937 by the addition of the following language:

"Including the buying, selling, processing, manufacturing, warehousing and transporting of tires, auto accessories, groceries, paint, farm machinery, farm supplies and other consumers goods; lease, own or operate facilities for these purposes; buy, sell, lease, mortgage, encumber or convey real estate or personal property as required in the operation of this business, as approved by the Board of Directors of the Association."

The petition alleged further that in 1938 the CCA by amendment of its charter purported to adopt the provisions of article 16, chapter 17, G. S. 1935, known as the coöperative marketing act, allegedly under the particular provisions of G. S. 1935, 17-1621.

It should be stated here for the sake of clarity that article 16, chapter 17, provided two methods by which any coöperative society organized under another statute might place itself under the provisions of that statute.

These are G. S. 1935, 17-1603, subparagraph (c), and G. S. 1935, 17-1621. It is now conceded that the defendant followed both these methods. There is no question but that it is properly organized and operating under the provisions of article 16, chapter 17 of G. S. 1935.

In the difference between these two statutes lies the real import of this cause.

The petition then alleged that the first section of the act under which defendant purported to act was G. S. 1935, 17-1601, which is as follows:

"In order to promote, foster, and encourage the intelligent and orderly marketing of agricultural products through coöperation and to eliminate speculation and waste; and to make the distribution of agricultural products as direct as can be efficiently done between producer and consumer; and to stabilize the marketing problem of agricultural products, this act is passed."

The petition then made the following allegation, which because of its importance will be set out verbatim. It is as follows:

"That the business activities and industrial pursuits of the defendant CAA are and have been at all times mentioned herein, substantially as follows:

"(a) International trade including shipping of petroleum products overseas to the extent that during 1946 approximately 3,000,000 gallons of motor oil were shipped to some 10 different foreign countries;

"(b) Enters into exchange agreements with all major and independent oil companies in connection with the transportation of oil and gasoline;

"(c) Owns huge oil refineries at Coffeyville, Kansas, Phillipsburg, Kansas, Scottsbluff, Nebraska, where it has a total annual production of more than 130 million gallons of refined fuels and can handle approximately 6 million barrels of crude oil per year; this in addition to one-third interest in a large refinery at McPherson, Kansas, which itself has a capacity of 6,000,000 barrels of crude oil per year;

"(d) Owns canning plants, lumber mills, printing plants, paint factories and other industries;

"(e) Buys, owns and holds extensive oil and gas leases and royalties and oil producing properties;

"(f) Drills, operates and produces approximately 450 oil wells· with annual oil runs of nearly one and three-fourths million barrels;

"(g) Owns and operates a vast oil pipe line system;

"(h) Auditing management services and insurance agencies as well as many other business and industrial pursuits.

"That the aforesaid business activities and industrial pursuits and enterprises conducted by the defendant CCA extend far beyond the authority of said 'Marketing Act'; that said defendant has usurped and assumed corporate powers not delegated to it by the State of Kansas, and to which it is not entitled under the laws of the State of Kansas; that said defendant CAA at

all times herein mentioned, was carrying on its industrial pursuits involving among other things oil refineries, oil production and vast system of oil pipe-lines under the guise of marketing agricultural products as a 'Marketing Association'; that said defendant was in these respects exceeding its corporate statutory powers."

The petition then alleged that the above business activities were carried on by defendant CCA through certain other associations, naming them. The officers of which associations were the same as those of defendant CCA and that the acts of these subsidiary companies were really the acts of the CCA. The petition then alleged that the CCA had been abusing its power and exercising corporate powers not conferred upon it by law, and these acts were contrary to law and to the purpose of the marketing act and in excess of any powers that could be conferred upon any corporation under the coöperative marketing act in question. Because all these activities were not carried on in order to promote, foster and encourage the intelligent and orderly marketing of agricultural products and to make the distribution of agricultural products operate as efficiently as could be done between producer and consumer; that the purpose of the CCA was not one of the purposes named in G. S. 1935, 17-1604; that the CCA was exercising powers in excess of those of an association organized under the provisions of G. S. 1935, 17-1605; that the CCA was violating G. S. 1935, 17-1606, and that under G. S. 1935, 17-1606, the members of the CCA were limited to either (a) persons engaged in the production of agricultural products, or (b) to any other association organized under section 17, article 16, G. S. 1935; that defendant CCA had as members at least 950 corporations which were not organized under that statute and were not eligible as stockholders or members and that this act of the CCA was contrary to the provisions of chapter 17, article 16, G. S. 1935, and constituted an unauthorized usurpation of power and authority. The petition next sets out the amount of preferred and common stock that defendant CCA had issued and sold as of February 28, 1947, and alleged that as of that date it had issued $958,570 of preferred stock in excess of its authority. The petition next alleged that CCA had sold $2,707,170 of capital stock that was not registered with the state corporation commission, as required by G. S. 1935, 17-1226, and had sold other securities as defined by G. S. 1945 Supp. 17-1223, that is, deferred patronage refund certificates in the amount of $4,398,674 and certificates of indebtedness

in the amount of $14,800, all without having been registered with the state corporation commission, as required by G. S. 1935, 17-1226; that CCA had advertised the sale of its securities without these securities having been registered and without submitting these advertisements to the corporation commission; that CCA in its industrial pursuits had dealt with nonmembers in violation of G. S. 1935, 17-1604; that G. S. 1935, chapter 17, article 16, designated as "The Coöperative Marketing Act" was enacted to foster and encourage the marketing of agricultural products for which purpose hundreds of properly organized marketing associations had come into existence in Kansas, and that G. S. 1935, chapter 17, article 15, known as "The Coöperative Societies' Act" was enacted to authorize the organization of coöperative associations for general business or industrial purposes but that CCA carried on an expansive industrial pursuit involving oil refineries and oil production and a system of oil pipe lines under the guise of marketing agricultural products under chapter 17, article 16, G. S. 1935. The petition then alleged that by reason of these acts CCA had breached its corporate duty toward the state of Kansas and assumed corporate powers not delegated to it. The prayer of the petition was as follows:

"That the defendant, the Consumers Coöperative Association, be dissolved; that its charter be forfeited and cancelled and its corporate existence as a 'Marketing Association' annulled; that it be enjoined from doing business and acting as a 'Marketing Association' and from any illegal usurpation of authority or powers under the provisions of Chapter 17, Article 16, G. S. 1935, and acts amendatory thereof; and that a receiver of its property be appointed at such time as this Court may deem proper and for such other and further relief as may be appropriate; and for the costs of this action.

"Plaintiff further prays that the State Corporation Commission of the State of Kansas be instructed and directed by the Court as to its duties and jurisdiction in the premises, and in harmony with the judgment rendered herein."

The answer of the defendant will be set out rather carefully because therein lies the crux of this case.

In paragraph III of the answer CCA admitted the organization of the corporation commission and in paragraph IV defendant, CCA admitted the allegations of paragraph IV of the petition but alleged that the plaintiff failed to inform the court fully of section 2 of article IV of defendant's articles of incorporation which is quoted as follows:

"The common stock of this association may be purchased, owned and/or

held only by producers of agricultural products and associations of such producers, who shall patronize the association in accordance with uniform terms and conditions prescribed thereby and only such producers shall be regarded as eligible members of the association."

In paragraph V of the answer defendant admitted the existence of G. S. 1935, 17-1601, which was set out therein, but alleged that plaintiff failed to inform the court that G. S. 1935, 17-1604, set out the purposes for which a coöperative marketing association could be formed. It quoted G. S. 1935, 17-1604, which provides as follows:

."An association may be organized to engage in any activity in connection with the marketing or selling of the agricultural products of its members, or with the harvesting, threshing, milling, preserving, drying, processing, canning. packing, storing, handling, shipping, or utilization thereof, or the manufacturing or marketing of the by-products thereof, or in connection with the manufacturing, selling, or supplying to its members of machinery, equipment, or supplies; or in the financing of the above-enumerated activities; or in any one or more of the activities specified herein. Nothing in this act shall authorize such association to engage in the banking business. Corporations organized under this act primarily for the purposes aforesaid may also, unless prohibited from so doing by their articles of incorporation, deal in the products of nonmembers, and render any of the services above named to nonmembers in connection with their products: *Provided,* That such associations shall not market, handle, process, store, or deal in the products of nonmembers to an amount greater in value than such as are handled by it for members."

Paragraph VI of the answer refers to paragraph VI of the petition. This is the paragraph where plaintiff set out the various incidental pursuits in which it alleged defendant was engaged.

As to paragraph VI (a) defendant admitted that it made some foreign sales but alleged that these sales consisted principally of surplus products necessarily obtained by the defendant in obtaining the supplies required by its members. It constituted less than ten percent of the defendant's business and was wholly incidental thereto.

As to paragraph VI (b) defendant answered that it did enter into exchange agreements but alleged that these agreements were with major or independent oil companies for the purpose of eliminating unnecessary or transportation costs.

As to paragraph VI (c) defendant admitted that it owned oil refineries but alleged that these refineries were maintained only for the purpose of manufacturing the products needed to supply its members and their requirements.

As to paragraph VI (d) defendant admitted that it owned and

operated canning plants, lumber mills, printing plants, paint factories and other industries, but alleged that these were operated for the purpose of enabling it to furnish supplies required by the members.

As to paragraph VI (e) and (f) defendant admitted that it owned and operated oil leases and royalties and drilled and operated oil wells but alleged that the ownership and operation of a reasonable number of oil wells was the only means by which it could maintain a crude oil supply sufficient to operate its refineries and manufacture refined products for the use of its members.

As to paragraph VI (g) defendant admitted it owned and operated a pipe line system but alleged that the pipe lines were maintained for the purpose of transporting crude oil to its refineries.

As to paragraph VI (h) defendant admitted that it operated the auditing service for its members but alleged that this service was maintained for the benefit of the different member associations. Defendant also admitted that it operated an insurance agency for the purpose of serving the insurance needs of defendant and its member associations. It denied the conclusions of law contained in paragraph VI and denied it was carrying on its business under the guise of marketing agricultural products and alleged that it was a farm purchasing coöperative association engaged in the business activities authorized under G. S. 1935, 17-1604.

In paragraph VII defendant admitted the general import of the allegations of paragraph VII of the petition and further alleged that these subsidiary corporations were authorized by G. S. 1935, 17-1603, subparagraph (b), which reads as follows:

"Any corporation organized under this act may unite with four other persons who are members or stockholders of said corporation, and form a corporation under the provisions of this act, for the purpose of acting as a subsidiary of the original corporation and conducting any part of the business of the original corporation."

Defendant denied the allegations of paragraph VIII with the exception it admitted some of its corporate members were not organized under article 16, chapter 17, G. S. 1935.

In paragraph IX of the answer defendant admitted the general import of paragraph IX of the petition with reference to its having issued excess stock and alleged that prior to the issuance of this stock it duly adopted an amendment to its charter increasing its authorized corporate stock and duly submitted a proper certificate

to the secretary of state on July 3, 1946, for filing, accompanied by the proper fees, and alleged that defendant was not advised until January 27, 1947, of any objections to the filing of this amendment, when it received a letter from the secretary of state advising it of the charter board's disapproval of this stock for the reason that the board thought defendant should not be organized under the coöperative marketing act but should be incorporated under the coöperative securities act; that the defendant had previously filed certificates of amendments increasing its authorized capital stock without objection and assumed that the amendments would be filed as a routine matter; had not since issued any such stock and would not do so until the amendment of its charter had been filed.

In paragraph X defendant admitted it had issued and sold capital stock and certificates of indebtedness and that it had issued deferred patronage refund certificates but denied that these capital stock certificates of indebtedness and deferred patronage refund certificates were required by law to be registered.

In paragraph XI defendant admitted the allegations of paragraph XI of the petition with reference to the advertising merits but denied that these were required to be approved by the state corporation commission.

In paragraph XII defendant denied the allegations of paragraph X except it admitted that it did transact a limited amount of business with nonmembers.

In paragraph XIII defendant denied that it was carrying on an expansive industrial program for itself under the guise of marketing agricultural products.

In paragraph XIV defendant further denied it had breached its corporate duty toward the state of Kansas or had assumed powers not delegated to it and alleged if it had to any extent exceeded its powers it stood ready, able and willing to correct the same when informed by this court that it had done so.

In paragraph XV defendant further alleged that the only controversy existing between the attorney general and the defendant was whether or not defendant might operate under the "coöperative societies' act" rather than the "coöperative marketing act."

Defendant in its answer quoted from an answer filed by plaintiff herein to the petition of defendant herein filed in the case of *Consumer Coöperative Ass'n v. Arn*, post, p. 489, as follows:

"Defendants also deny the allegations contained in paragraph seven of Plaintiff's petition and allege and state that if the Plaintiff Association (present defendant) is not legally entitled to exist as a 'Marketing Association' under Section 17-1601 *et seq.*, G. S. 1935, it can properly carry on its present business operations either as a 'Coöperative Society' under Section 17-1501 *et seq.*, or as a corporation under the General Corporation Laws."

Defendant further alleged that the request for dissolution of the defendant corporation was without support or foundation.

The prayer of the answer was as follows:

"WHEREFORE, Defendant having fully answered, prays that the Court deny all of the relief prayed for by the Plaintiff and that if the Court find that Defendant has, through a misunderstanding of the law, exceeded any of its authority or breached any of its obligations to the State of Kansas, the defendant be so informed by the Court and given an opportunity to correct the same.

"Defendant further prays that the Court instruct all parties as to their rights and duties in the premises, and that Defendant recover its costs in this action."

For a reply to this answer the plaintiff referred to Exhibit "B" which was attached to the reply and denied the allegations of the answer particularly those words with reference to paragraph VII.

The reply also denied the import of the allegations of paragraph VIII of the answer that merely some of CCA's corporate stockholders were not organized under article 16, chapter 17, G. S. 1935, and alleged that approximately 950 of the CCA's corporate members were not so organized.

The reply also contained the following allegation:

"Plaintiff admits that said Defendant, Consumers Coöperative Association could be chartered under the Coöperative Societies Act (ch. 17, art. 15, G. S. 1935), and as a coöperative society could then conduct any business or industrial pursuit; but that said Defendant CCA must then comply with said chapter 17, article 15, G. S. 1935, with reference to the residence of members, payment of dividends, voting rights, stock ownership, and in all other respects."

The plaintiff and defendant executed an agreed statement of facts, as follows:

"In order to eliminate all issues of fact existing between the plaintiff and the defendant, the Consumers Coöperative Association, it is hereby stipulated and agreed as follows:

"I

"Exhibit B, attached to Plaintiff's Reply, is the 18th Annual Report of CCA to its stockholders; and Exhibit C, attached to Plaintiff's Reply, is a 1947 publication by CCA to its members and stockholders; that the facts, statements and references contained in said Exhibits B and C pertaining to the business activities and pursuits of the CCA are accurately stated and hereby admitted.

"II

"The defendant CCA has approximately 1,035 common stockholders or members; that 22 of said common stockholders are individuals and are directors of CCA; that 63 of said common stockholders are Kansas Coöperative Associations organized under chapter 17, article 16, G. S. 1935; that the other 950 of said common stockholders own approximately 93% of the CCA common stock, and are other coöperative associations not organized under chapter 17, article 16, G. S. 1935. Of the 950 associations last mentioned, approximately 200 are Kansas coöperative societies organized under chapter 17, article 15, G. S. 1935, and 750 are associations organized in several other states and Canada, and in six European countries.

"III

"The Articles of Incorporation and Bylaws of the CCA on file in the office of the Secretary of State are set forth in full and attached to this Stipulation.

"IV

"When a purchaser or patron of the defendant CCA (either member or nonmember) purchases commodities from CCA, said purchaser is delivered annually a Deferred Patronage Refund Certificate, which certificate represents said purchaser's share of profit or savings in CCA. A photostatic copy of one of said certificates issued by CCA is attached hereto."

Exhibit "B" to which reference is made in the reply and the agreed statement of facts is the 18th annual report of the defendant CCA to its stockholders. Exhibit "C" is a 1947 glossed brochure publication. They have both been available to us during the consideration of this case. They contain rather full and complete statements as to the activities and business enterprises carried on by the defendant CCA.

The issues made by the answer and cross petition of the state corporation commission and the answer of CCA thereto will be dealt with later in this opinion.

In the quo warranto action, the state asks first whether the provisions of article 16, chapter 17 of G. S. 1935 authorize the business activities and industrial pursuits being conducted by the defendant. It will be remembered that chapter 17, article 16 is the "Coöperative Marketing Act." It is conceded that CCA was and is engaged in international trade, including the shipping of petroleum products overseas to the extent that during 1946 approximately three million gallons of motor oil were shipped to some ten different countries; that it has entered into exchange agreements with all major and independent oil companies in connection with the transportation of oil and gasoline; that it owns and operates oil refineries at Coffeyville, Kan., Phillipsburg, Kan., and Scottsbluff, Neb., where it has

a total annual production of more than 130 million gallons of refined fuels and can handle approximately six million barrels of crude oil a year, in addition to a one-third interest in a refinery at McPherson; it owns and operates canning plants, lumber mills, soy bean plants, paint factories and printing plants; it is engaged in manufacturing and owns and operates retail service stations and food stores; buys, owns and holds extensive oil and gas leases and royalties and oil producing properties and drills, operates and produces some 450 or more oil wells with annual oil runs of nearly one and three-fourths million barrels; owns and operates a system of oil pipe lines and publishes a biweekly paper; operates auditing management services and insurance agencies. The state includes in its brief and attaches great significance to a quotation from Exhibit "C" as follows:

"It (CCA) is building good will internationally by membership in coöperative organizations all over the world, by exporting petroleum products to coöperative wholsales overseas, and by acting as host frequently to visiting deputations of overseas coöperators who come to Kansas City for a close-up of the largest petroleum co-op in the United States."

The state first argues that courts must seek simply to ascertain the legislative intent. The rule is stated in *American Glycerin Co. v. Freeburne,* 157 Kan. 22, 138 P. 2d 468, about as well as anywhere. There we said:

"Reasons which prompt legislation are within the province of the lawmakers. When the intent and purpose of a law is clear, the statute is a sufficient reason for requiring compliance with its provisions." (p. 25.)

No one questions the correctness of that rule. The trouble arises where courts being composed of ordinary fallible men are confronted with the duty of interpreting what the legislature meant at the time it acted, when ofttimes the court is speaking at a time far removed.

The state next points out what was stated by us at the outset of this opinion that Kansas has enacted legislation for the creation of two types of coöperatives, that is, coöperative societies, article 15, chapter 17, G. S. 1935, which may conduct any business or industrial pursuit, and agricultural coöperative marketing associations, article 16, chapter 17, G. S. 1935, which are for the disclosed purpose of marketing of agricultural products. The state quotes from an article by Mr. John Hanna in his discussion of constitutional questions pertaining to agricultural coöperatives in 29 Michigan Law Review, 148, as follows:

"It will be remembered that a coöperative corporation need have nothing to do with agriculture. While this article is concerned with agricultural associations, it may be noted that many states have general coöperative association laws besides the law known popularly as the standard agricultural marketing act."

It should be stated here that CAA concedes the correctness of the above statement and argues that there may be selling coöperatives and purchasing coöperatives and both functions may be joined in the same society and are so joined in article 16, chapter 17, G. S. 1935.

The state next points out that CAA is carrying on its activities as an "agricultural marketing association" so we are concerned here now only with article 16, chapter 17, G. S. 1935. The state points out and quotes G. S. 1935, 17-1601, and argues that it sets the pattern for the entire act. The state first quotes the title of the act as it appears in chapter 148 of the Laws of 1921, which is as follows:

"AN ACT to promote, foster and encourage the intelligent and orderly marketing of agricultural products through coöperation, and to eliminate speculation and waste; and to make the distribution of agricultural products as direct as can be efficiently done between producer and consumer; and to stabilize the marketing problems of agricultural products."

The state then quotes the first section of the act, which is now G. S. 1935, 17-1601, as follows:

"In order to promote, foster, and encourage the intelligent and orderly marketing of agricultural products through coöperation and to eliminate speculation and waste; and to make the distribution of agricultural products as direct as can be efficiently done between producer and consumer; and to stabilize the marketing problem of agricultural products, this act is passed."

The state attaches great significance to the fact that the title to the act and the first section of it are identical and argues that all subsequent sections dealing with purposes, powers, members and organization procedure must be carried out in accordance with the "Title" of the act and with the declaration of policy contained in the first section just quoted. The state calls attention to subsection (d) of section 17-1602, in which it is provided that marketing associations are not organized to make a profit for themselves but for their members as producers, with emphasis on the words "members as producers."

The state next quotes section IV of the original act, which is G. S. 1935, 17-1604:

"An association may be organized to engage in any activity in connection with the marketing or selling of the agricultural products of its members, or with the harvesting, threshing, milling, preserving, drying, processing, canning, packing, storing, handling, shipping or utilization thereof, or the manufacturing or marketing of the by-products thereof, or in connection with the manufacturing, selling or supplying to its members of machinery, equipment, or supplies; or in the financing of the above-enumerated activities; or in any one or more of the activities specified herein. Nothing·in this act shall authorize such association to engage in the banking business."

The state then argues that the purposes outlined in that section must be carried on in such a way as to put into effect the policy and purposes of G. S. 1935, 17-1601, and that the additional powers conferred on coöperative societies by the amendment of 1931 must be exercised pursuant to the title and declared policy of the act, as set out in G. S. 1935, 17-1601. Stated succinctly, the state contends:

"For example, under section 17-1604 a Coöperative Marketing Association may engage in the business of processing or shipping—but it must do so in connection with agriculture and with agricultural products. Such an ,Associaton could process an alfalfa crop for its members into alfalfa meal as an agricultural product for its members—but Plaintiff submits that such a Coöperative Association could not drill oil wells or mine ores and process and refine such mineral products under section 17-1604. Neither can such an Association under that section engage in the operation of a vast oil pipeline system or trans-ocean shipping because the word 'shipping' appears in the statement of purposes although such Association probably could ship and transport grain, cattle, and other agricultural products for its farm members."

It should be stated here that defendant contends that the foregoing is such a narrow construction of the statute as to defeat its obvious purpose and that the latter portion of G. S. 1935, 17-1604, reading "or in connection with the manufacturing, selling, or supplying to its members of machinery, equipment or supplies" confers much broader powers on coöperatives organized pursuant to the act than the state is ready to admit. Around the two points of view just expressed revolves this lawsuit.

The state next argues that there is no connection between the pursuits carried on by defendant and the marketing of farm products and contends that if· the CCA can carry on the business in which it is engaged then it could manufacture and sell clothing, furniture, automobiles or engage in other business in which it wished to engage. In support of this position the state cites and relies on *Baldwin County Producers' Corporation v. Frishkorn*, 17 Ala. App.

84, 81 So. 862; *Rockingham Bureau v. Harrisonburg,* 171 Va. 339, 198 S. E. 908; *State ex inf. Huffman v. Show-Me Power Coöperative,* 354 Mo. 892, 191 S. W. 2d 971. Great reliance is placed on the case of *Rockingham Bureau v. Harrisonburg,* supra, on account of a definition of the word "supplies" as used in the Virginia statute, contained in that opinion. We shall discuss that opinion later.

The state next asks the question—Can an association such as CCA conduct the activities and industrial pursuits it is now conducting as a coöperative under any Kansas law? CCA answers that it could if it was organized and doing business under article 15, chapter 17, G. S. 1935, instead of under article 16, chapter 17, G. S. 1935, as it now is.

The foregoing rather fully states the position of the state on the question of whether defendant is unlawfully usurping corporate powers on account of the business it is carrying on.

To avoid confusion we shall finally consider that question and dispose of it before stating other matters raised in the pleadings.

Counsel for CCA at the outset of their brief make the following statement:

"In our opinion, this litigation will serve no useful purpose unless it is first determined whether or not an agricultural coöperative may be organized under the Coöperative Marketing Act for the single purpose of supplying its members with machinery, equipment or supplies, and if so, are any of the activities in which the Defendant is engaged, beyond the scope of the powers granted it by the Coöperative Marketing Act.

"Then if any of the Defendant's activities are beyond the power and authority granted it by the Coöperative Marketing Act, both the State and the Defendant will be properly informed as to what activities must be discontinued, or such services rendered the farmer members through some other form of organization. We can not therefore depart from the questions of law presented for the Court's determination in Defendant's original motion. These questions are as follows:

"Does the Defendant operating under the Coöperative Marketing Act, have authority to engage solely in the business of obtaining and furnishing supplies to its members, who consist of individual producers of agricultural products and associations of such producers?

"(a) If the defendant does have such power and authority, does it have the power and authority to manufacture such supplies?

"(b) If the Defendant does have power and authority to manufacture supplies, does it have the power and authority to manufacture crude oil refined products?

"(c) If the Defendant does have the power and authority to manufacture crude oil refined products to supply its members, does it have the authority

to own and operate such oil wells and pipelines as are necessary to the existence of its refinery operations?

"(*d*) Does the Defendant have authority to engage in the activities set out in subparagraphs (*d*) and (*h*) of Paragraph VI of the petition?

"2. Does the Defendant, whose chief purpose is obtaining, manufacturing and furnishing supplies for its members, have the authority under the Coöperative Marketing Act, to furnish supplies to nonmembers?

"(*a*) Does the Defendant have authority to dispose of by-products from its manufacturing plants to nonmembers?

"(*b*) Does the Defendant have authority to dispose of surplus, caused by the seasonal operations of its members, to nonmembers?

"3. Does the Defendant have authority to enter into agreements for the exchange of refined products in order to reduce transportation costs?

"4. Does the Defendant have authority under the Coöperative Marketing Act, to accept as members, associations of agricultural producers which are not organized under the Coöperative Marketing Act?

"5. Is the Defendant, while operating as an agricultural coöperative association, required to register its securities with the State Corporation Commission under the Speculative Securities Act?

"(*a*) Is the evidence of a patronage refund due a member, an exempt security within the meaning of the Kansas Securities Act, even though the other securities of a coöperative association are or are not exempted?"

It will be noted the questions as stated above broaden somewhat the scope of the inquiry, as stated in the brief of the state. However, the difference is not so great as might at first appear. If the arguments advanced by the state are good or if only some of them are good there might arise a situation where only a limited ouster would be ordered or perhaps defendant might be ordered to correct such corporate abuses as are found to exist.

Defendant first calls our attention to the rule stated in *Craig v. Craig,* 143 Kan. 624, 56 P. 2d 464. There we said:

"In determining the intent of the legislature the court is not limited to a mere consideration of the words employed but should look to the existing conditions, the causes which impelled the enactment, and to the objects sought to be attained." (p. 628.)

It will be remembered the state called our attention to what we said in *American Glycerin Co. v. Freeburne,* 157 Kan. 22, 138 P. 2d 468, as follows:

"Reasons which prompt legislation are within the province of the lawmakers. When the intent and purpose of a law is clear, the statute is a sufficient reason for requiring compliance with its provisions." (p. 25.)

Somewhere between these two rules lies the path along which the feet of justice must be guided.

Defendant first makes the point that the courts have recognized the economic necessity of agricultural coöperatives. Cited are, *Northern Wis. Co-operative Tobacco Pool v. Bekkedal*, 182 Wis. 571, 197 N. W. 936; *Minn. Wheat Growers Co-op. Market Assn. v. Huggins*, 162 Minn. 471, 203 N. W. 420 and *Nebraska Wheat Growers Ass'n v. Smith*, 115 Neb. 177, 212 N. W. 39. In the latter case the supreme court of Nebraska said:

"The legislatures of more than 30 of our states, including our own, have enacted substantially similar legislation to the Kansas act before us. These evidences of uniform opinion disclose that by universal consent it is now conceded that the basic economic condition of agriculture at the present time requires the remedies contained in the acts referred to, and that their application is deemed reasonable and just, and to operate for the good of the entire nation and every citizen thereof." (p. 189.)

The defendant contends that all the statutes recognize two types of agricultural coöperatives, the marketing coöperative and the purchasing coöperative. It points out the evil that flowed from a situation where agricultural products were sold at a low price during the harvest season and retailed to the consumer at a high price after they reached the middleman, and contends that the creation of a marketing coöperative was the remedy created for this distressing situation and that equally necessary and inevitable was the creation of coöperatives for the purpose of purchasing their supplies. Defendant says:

"We must then have agricultural coöperatives which serve two very distinct purposes:

"1. Marketing coöperatives, which market the products of the farm.

"2. Purchasing coöperatives, which furnish their members with supplies.

"A single agricultural coöperative may perform either or both of these functions. All of the statutes which we have examined so provide."

It will be easier to follow the argument of defendant if we read the following statement from its brief:

"It was therefore necessary that the individual agricultural coöperatives furnishing supplies to the farmers, pool their resources for the purpose of acquiring the supplies at the most advantageous price, and at the same time, assure themselves of a definite source of supply. In order that a source of supply be assured, it was equally necessary that to some extent they enter into manufacturing. This type of organization was presented by Nourse as follows:"

Defendant makes the point that agricultural coöperative legislation should be liberally construed. It cites: *Wheat Growers Association v. Schulte*, 113 Kan. 672, 216 Pac. 311; *Nebraska Wheat*

*Growers Ass'n v. Smith*, 115 Neb. 177, 212 N. W. 39; *The State v. Standard Oil Co. et al.*, 130 Tex. 313, 107 S. W. 2d 550; *Texas C. C. B. Assn. v. Aldridge*, 122 Tex. 464, 61 S. W. 2d 79; *State v. Hardin County Coöperative*, 226 Iowa 896, 285 N. W. 219.

In *Wheat Growers Association v. Schulte*, supra, we said:

"In such a case, the general rule that the language of the statute will be liberally construed for the purpose of upholding and promoting its object, and that strained and technical interpretations of its provisions for the purpose of impairing and defeating its manifest purpose will be avoided, is applicable." (Syl. ¶ 4.)

Among the purposes of the Kansas Coöperative Marketing Act was the purpose to make possible the organization of societies by which the individual farmer could maintain some control over the prices of his products and maintain some control over the purchase price of his supplies. We must give it such an interpretation as to enable coöperative societies organized under its provisions to carry out such a purpose if we can do so by any reasonable interpretation of the language used. In the manner in which this court follows the above lies, in a large measure, the difference between the state and the defendant. The plaintiff stoutly argues that the sole purpose of the Kansas Agricultural Coöperative Act, article 16, chapter 17, G. S. 1935, has to do with marketing the farmer's products, nothing more. The defendant argues just as stoutly that it has that purpose and the further purpose of exercising some control over whatever the farmer buys and uses in the operation of his farm.

It will be remembered that the state placed great reliance on G. S. 1935, 17-1601, and argued that all the powers and purposes conferred on a coöperative society by the following sections were limited by this general policy section. The soundness of the position of the state depends in a large measure on the soundness of that argument.

We must also consider G. S. 1935, 17-1604. The provisions of that section are as follows:

"An association may be organized to engage in any activity in connection with the marketing or selling of the agricultural products of its members, or with the harvesting, threshing, milling, preserving, drying, processing, canning, packing, storing, handling, shipping, or utilization thereof, or the manufacturing or marketing of the by-products thereof, or in connection with the manufacturing, selling, or supplying to its members of machinery, equipment, or supplies; or in the financing of the above-enumerated activities; or in any one or more of the activities specified herein. Nothing in this act shall authorize such association to engage in the banking business. Corporations organized

under this act primarily for the purposes aforesaid may also, unless prohibited from so doing by their articles of incorporation, deal in the products of non-members, and render any of the services above named to nonmembers in connection with their products: *Provided,* That such association shall not market, handle, process, store, or deal, in the products of nonmembers to an amount greater in value than such as are handled by it for members."

These provisions may be more graphically set out as follows:
1. Marketing or selling agricultural products.
2. Threshing, milling, preserving, or in any manner handling or utilizing the products.
3. To either manufacture or market by-products.
4. Or to engage in any activity in connection with the manufacturing, selling or supplying to its members of machinery, equipment or supplies.
5. And to engage in any one or more of the activities specified.

Special attention is called to the provisions of the fourth purpose, as set out above.

The defendant points out the oft-repeated rule that in construing a statute courts should attempt to give effect to every word and clause. Cited are, *Yehle v. Stamey-Tidd Const. Co.,* 150 Kan. 440, 94 P. 2d 328; *Wyandotte County Comm'rs v. Adams,* 155 Kan. 160, 123 P. 2d 818; *Bridge Company v. K. P. Rly. Co.,* 12 Kan. 409; and *Gardenhire v. Mitchell,* 21 Kan. 83.

It is worthy of note that G. S. 1935, 17-1604, was section 4 of chapter 148 of the Laws of 1921. This chapter authorized the organization of marketing coöperatives. It, amongst others, was amended and reënacted by chapter 150 of the Laws of 1931. The following language was added:

"Corporations organized under this act primarily for the purposes aforesaid may also, unless prohibited from so doing by their articles of incorporation, deal in the products of nonmembers and render any of the services above-named to nonmembers in connection with their products: *Provided,* That such associations shall not market, handle, process, store, or deal in the products of nonmembers to an amount greater in value than such as are handled by it for members."

Section 1 of chapter 148 of the Laws of 1921, now G. S. 1935, 17-1601, was not reënacted nor was the title to the 1921 act used in the 1931 act. Surely had the legislature intended the entire act to be limited by the language of G. S. 1935, 17-1601, that section would have been reënacted.

This argument especially is persuasive in view of the fact that

by section 3 of chapter 150 of the Laws of 1931, same being now G. S. 1935, 17-1605, the legislature amended section 5 of chapter 148 of the Laws of 1921. This was the section which stated the powers the coöperative society organized under it should have. Section 5 of chapter 148 of the Laws of 1921 provided as follows:

"Each association incorporated under this act shall have the following powers: (a) To engage in any activity in connection with the marketing, selling, harvesting, threshing, milling, preserving, drying, processing, canning, packing, storing, handling or utilization of any agricultural products produced or delivered to it by its members; or the manufacturing or marketing of the by-products thereof; or in connection with the purchase, hiring, or use by its members of supplies, machinery, or equipment; or in the financing of any such activities; or in any one or more of the activities specified in this section."

### Section 3, chapter 150, Laws of 1931, provided as follows:

"That section 17-1605 of the Revised Statutes of 1923 be and the same is hereby amended to read as follows: Sec. 17-1605. *Powers of association.* Each association incorporated under this act shall have the following powers:

"(a) To engage in any activity in connection with the marketing, selling, harvesting, threshing, milling, preserving, drying, processing, canning, packing, storing, handling, or utilization of any agricultural products produced or delivered to it by its members; or the manufacturing or marketing of the by-products thereof, or in connection with the purchase, hiring, or use by its members of supplies, machinery, or equipment; or in the financing of any such activities; or in any one or more of the activities specified in this section.

"(b) To borrow money without limitation as to amount of corporate indebtedness or liability; and to make advances to members.

"(c) To act as the agent or representative of any member or members in any of the above-mentioned activities.

"(d) To purchase or otherwise acquire; and to hold, own, and exercise all rights of ownership in, and to sell, transfer or pledge or guarantee the payment of dividends or interest on, or the retirement or redemption of shares of the capital stock or bonds, of any corporation or association engaged in any related activity, or in the warehousing or handling or marketing of any of the products handled by the association.

"(e) To establish reserves and to invest the funds thereof in physical facilities, stock of subsidiary corporations or bonds or in such other property as may be provided in the bylaws.

"(f) To buy, hold, and exercise all privileges of ownership over such real or personal property as may be necessary or convenient for the conduct and operation of any of the business of the association or incidental thereto.

"(g) To do each and everything necessary, suitable, or proper for the accomplishment of any one of the purposes or the attainment of any one or more of the subjects therein [herein] enumerated; or conducive to or ex-

pedient for the interest or benefit of the association; and to contract accordingly, and in addition to exercise and possess all powers, rights, and privileges necessary or incidental to the purposes for which the association is organized or to the activities in which it is engaged, and in addition, any other rights, powers and privileges, granted by the laws of this state to ordinary corporations, except such as are inconsistent with the express provisions of this act; and to do any such thing anywhere."

It will be readily noted that ten years after the enactment of the original act of 1921 the legislature saw fit to confer or at least to confirm the fact that it had already conferred much broader powers upon a society created pursuant to its terms than a reading of G. S. 1935, 17-1601 would appear to have intended. Special attention is called to subparagraph (a) and to subparagraph (g).

It is also worthy of note that G. S. 1935, 17-1604 after enumerating the purposes for which a society might be organized provided: "Nothing in this act shall authorize such association to engage in the banking business." This was in the original act. Had the legislature intended to limit by the terms of G. S. 1935, 17-1601, the activities in which the society would be empowered to engage it is difficult to see why it would think it necessary to especially provide that such a society could not engage in the banking business. A reasonable inference to be drawn is that the legislature contemplated that such a society could engage in any business necessary in furnishing supplies to a member but the banking business.

With reference to the argument that the whole act must be circumscribed by the provisions of the policy section in 50 Am. Jur. 297, sec. 309, the rule is stated as follows:

"The preamble is especially helpful when the ambiguity is not simply that arising from the meaning of particular words, but such as may arise in respect to the general scope and meaning of a statute. The preamble is not, however, conclusive. Where the language of a statute is plain and unambiguous, the courts may not resort to the preamble of the act. It has also been held that the necessity of resorting to the preamble in order to ascertain the true intent and meaning of the legislature is fatal to any claim which by ordinary rules of interpretation can be sustained only by clear and unambiguous language. The preamble is not an essential part of the act, and cannot confer or enlarge powers. Express provisions in the body of the act can not be controlled or restrained by the preamble. Hence, it has been stated by some courts as the general rule that if there is a broader proposition expressed in the act than is suggested in the preamble, the body or enacting part of the law will prevail over the preamble."

We shall next consider what is included in the phrase "engage in any activity in connection with the manufacturing, selling or supplying to its members of machinery, equipment or supplies." The first question is—If an agricultural coöperative association has authority to engage in the activity of furnishing its members with machinery, equipment and supplies, does it have authority to manufacture them? In making an affirmative answer to this question we have considered the language of G. S. 1935, 17-1604, which has been quoted two or three times already in this opinion, where there is conferred upon the coöperative society authority to engage in an activity "in connection with manufacturing, selling or supplying to its members of machinery, equipment or supplies."

We must also consider the provisions of G. S. 1935, 17-1605 (g), which has already been quoted in this opinion.

The act had already, in G. S. 1935, 17-1604, provided that such a society could be organized for the purpose of engaging in any activity in connection with "manufacturing, selling or supplying" to its members of "machinery, equipment or supplies." Then G. S. 1935, 17-1605 (g) provided it might "do each and everything necessary, suitable or proper." Broader terms would be difficult to imagine. Then it says "or conducive to or expedient for the interest or benefit of the association." These are all-inclusive terms. Then it says "and in addition, any other rights, powers and privileges, granted by the laws of this state to ordinary corporations, except such as are inconsistent with the express provisions of this act."

There is really not much more to be said in answering this question. The statute either means what it says or it does not. It would be difficult in view of what we have said in the cases heretofore cited about giving meaning to all the words used in the statute to say the statute did not confer that power upon the society created pursuant to it.

The next question is—If the defendant does have power and authority under the act to manufacture equipment, machinery and supplies, does it have power and authority to manufacture refined products of crude oil or in other words, gasoline and lubricating oil? This is really the question that brought on this lawsuit. If the CCA had not engaged in operating its refineries and kindred activities it is doubtful if the other activities in which the state alleges it was engaged would have brought on as drastic a proceding as an ouster suit. In other words, there·was no particular

attack on agricultural coöperatives as long as they confined their activities to the furnishing to their members of a few incidental supplies, such as binding twine or axle grease or perhaps an occasional roll of barbed wire. This court will take judicial notice of the fact that in the present state of the art of farming, gasoline or the somewhat broader term "farm motor fuel" is one of the costliest items in the production of agricultural commodities. The writer has no doubt there are young farm boys who have never experienced the delight of guiding a team of mules along a furrow, but their agricultural operations have been confined to what fun they could get out of driving a tractor. Perhaps to the writer of this opinion, about 30 years removed from his operations as a farm hand, this delight appears more vivid than it did at the time he was going through it. However, there is still a bond between a farm hand and a good team of horses or mules. Cultivating corn with a team and a tongueless cultivator when an eighteen-year-old boy could reach back with his foot and kick the dirt off of an unfortunate stalk of corn was at the same time an art and an applied philosophy. Anyway, gasoline and tractors are here and this court is not going to say that motor fuel oil is not a supply necessary to the carrying on of farming operations within the purview of the terms of G. S. 1935, 17-1604 and related sections. Indeed it is about as well put as can be on page 18 of state's Exhibit "C" where defendant says:

"Producing crude oil, operating pipe lines, and refineries, are also part of the business of farming. It is merely producing synthetic hay and oats for iron horses. It is 'off-the-farm-farming' which the farmer, in concert with his neighbors, is carrying on. Frequently it determines whether he makes or loses money in any given year on his 'fenced-in' farm. Production of power farming equipment, then, is logically an extension of the farmers' own farming operations."

After disposing of the question of the operation and authority to manufacture crude oil and refined products the next question is—Does CCA have authority to own and operate such oil wells and pipe lines as are necessary to the existence of its refinery operations? The fact that this question has arisen demonstrates the truth of the doctrine that once a step is taken in a certain economic direction the end lies along a path which perhaps was not contemplated at the outset when the step was first taken. It is easy to see what happened when this agricultural coöperative started a refinery. One could not have been in touch with public events in the state and not have been aware of it.

The defendant calls our attention to the fact that when coöperative associations first organized their refineries for the purpose of manufacturing tractor fuel and their refined products a movement was immediately started to eliminate them from the industry, by control of the crude oil supply. This, of course, is one phase of the old fight that has always ensued when some new movement first gets under way. The experts at weaving hand looms were just as provoked when machinery for weaving began to displace their efforts. The cotton pickers of the south see that the cotton picking machinery invented will displace many hand cotton pickers in that industry. The same coöperative effort which caused the society to buy and take over a refinery caused it to drill wells and lay pipe lines. Once we reject the narrow construction the state asks us to place upon the act due to G. S. 1935, 17-1601, we have no difficulty in reaching the conclusion that the defendant did not exceed its corporate authority in laying the pipe lines and drilling oil wells. (See *Coöperative Assn. v. Jones*, 185 N. C. 265, 117 S. E. 174.) There the supreme court of North Carolina said:

"It is common knowledge that two years ago the coöperative marketing of peanuts in northeastern North Carolina and southeastern Virginia was paralyzed because the coöperative associations did not own cleaning establishments. They were dependent on their enemies to do the cleaning for them, and those enemies easily imposed such terms as absorbed all profit. Now the peanut corporations, like the cotton and tobacco, are provided with all facilities.

"The enemies of the coöperative system would be delighted if the courts were to hold that a coöperative association is not permitted to use its own money in establishing warehouses, prize houses, redrying and processing plants, and were forced to depend for these facilities upon such terms as the association could make with its competitors. The latter would be in the position of an army well armed meeting in battle another army with no arms at all.

"The coöperative association is merely granted by the statute the privilege of building or constructing the necessary instrumentalities for carrying out the purposes of the association, and of using its own money therefor, under terms and conditions specified in the contract and agreed to by all its members."

In subparagraphs (*d*) and (*h*) of paragraph VI of the petition the state charged the defendant exceeded its corporate authority in owning canning plants, lumber mills, printing plants, paint factories and other industries and in furnishing auditing managing service and insurance agencies.

The argument of defendant is that these activities are carried on to furnish supplies to the members of the coöperative societies, the

manufacture of which makes it necessary to the carrying on of a successful enterprise. About the only authority upon which the state relies is *State, ex inf. Huffman v. Show-Me Power Coöperative*, supra. The opinion is really not authority for the state's position.

That was a quo warranto action to test the power of the coöperative society to engage in the electric utility business. The statute under which the coöperative is organized was not nearly as broad and did not confer nearly as sweeping powers on the society as does our statute. About all the case holds is that an electric utility business was neither a mercantile business nor one for the purpose of purchasing or selling to shareholders and others groceries and other articles of merchandise.

The state also relies upon *Rockingham Bureau v. Harrisonburg*, supra. That case turned upon the definition of the word "supplies" in the Virginia statute. That language was as follows:

"And the term 'supplies' shall include seed, feed, fertilizer, equipment and other products used in the production of crops and livestock and in the operation of farms and farm houses." (p. 343.)

Under the rule of *ejusdem generis*, the court held:

"This rule means that when a particular class of persons or things is spoken of in a statute and general words follow, the class first mentioned must be taken as the most comprehensive, and the general words treated as referring to matters *ejusdem generis* with such class. The effect of general words when they follow particular words being thus restricted." (p. 344.)

The Kansas Coöperative Marketing Act we are discussing does not define or restrict the meaning to be given the word "supplies." Furthermore our act also uses the word "equipment" and "machinery." We have demonstrated that.

We now proceed to another phase of this case. It is expressed in the following question: Does the defendant have authority under article 16, chapter 17, G. S. 1935, to furnish supplies to nonmembers? For the purpose of this discussion that question might be better stated as follows: If the defendant has authority to manufacture and furnish supplies for its members would the fact that it furnishes supplies to nonmembers be sufficient grounds upon which to base an order of ouster against the defendant or to appoint a receiver for it?

The argument of the defendant on this matter is purely a practical one. They state it is not their purpose to furnish machinery, supplies

or equipment to nonmembers. They point out that the coöperative marketing act prohibits such association from dealing with nonmembers to an amount greater in value than with members, and that the requirements of the federal government permit the doing of business with nonmembers to 15 percent of the business done with members. There are some instances when it becomes necessary to do business with nonmembers, such as in a small farming community, when the coöperative store is the only source of supply for the farmers in the community who do not belong to the coöperative society; that any manufacturing plant whether it deals in the manufacturing of farm products or machinery, equipment or supplies, necessarily has some by-products such as ordinarily are produced at a soy bean mill or similar plant. They point out that their agreements for the exchange of refined products are made with other companies to avoid transportation costs and that their shipment of oil products to foreign countries was to dispose of a surplus production and purely incidental to the operation of these refineries.

In this connection we note the provision of G. S. 1935, 17-1604, as follows:

"Corporations organized under this act primarily for the purposes aforesaid [one of these purposes would be manufacturing, selling or supplying to its members of machinery, equipment or supplies] may also, unless prohibited from so doing by their articles of incorporation deal in the products of nonmembers, and render any of the services above named to nonmembers in connection with their products."

Surely the provision with relation to supplies should be construed in connection with the above provision providing for dealing "in the products of" and rendering service to nonmembers. Furthermore, there is subparagraph (f) of G. S. 1935, 17-1605. This subparagraph gives the society power to exercise all privileges of ownership over such personal property as may be necessary or convenient for the conduct and operation of any of the business of the association or incidental thereto.

It would be a useless gesture to hold that the defendant could own a refinery and still could not dispose of some of the by-products of a refinery, such as asphalt or the heavier oils, just because a farmer could not use it, or to hold that because there was not as much demand for gasoline during the winter months as in the summer a refinery must then shut down or run at a greatly reduced scale. To so hold would be in effect to hold that the society could not operate

a refinery. Such a holding would require that we give to the statute a narrow, strict construction to defeat its purpose rather than a broad liberal one to insure the accomplishment of its purpose.

This does not mean that the defendant can engage in any industry or pursuit wholly or principally for the benefit of nonmembers. The business with nonmembers must be such as is incidental only to the principal purpose of any of defendant's activities.

This brings us to the end of the argument of parties as to whether the defendant has been guilty of exceeding its corporate powers.

We shall now proceed to a consideration of another question raised by the state, which has to do with the membership of the CCA.

This is a phase of the action distinct from those we have treated so far. It involves the actual organization of the defendant. It will be remembered the state pleaded that defendant was violating G. S. 1935, 17-1606 because its members were limited by that section under "(a)" either persons engaged in the production of agricultural products to be handled by or through the association, or under "(c)" to any other association organized under article 16, chapter 17, G. S. 1935, and that CCA had as members at least 950 corporations which were not organized under that chapter and these 950 corporations owned at least 93 percent of defendant's stock. The state alleged that this practice of defendant constituted a usurpation of power and authority.

In its answer the defendant denied the foregoing allegations except it admitted that some of its members were not organized under article 16, chapter 17, G. S. 1935. What this amounted to was a denial of the legal conclusion pleaded.

In the stipulation as to the facts, the parties agreed that CCA had approximately 1,035 common stockholders or members; that 22 of these stockholders were individuals and directors of CCA; that 63 of them were Kansas coöperative associations organized under article 16, chapter 17, G. S. 1935; that 218 were coöperative associations organized under article 15, chapter 17, G. S. 1935, and that the other 732 of the common stockholders were coöperative associations organized under the laws of other states and six European countries.

To sustain its argument on this point, the state first refers to G. S. 1935, 17-1606. This is the same as the original section of chapter 148, Laws of 1921. It provides as follows:

"(a) Under the terms and conditions in its bylaws, an association may ad-

mit as members, or issue common stock only to persons engaged in the production of the agricultural products to be handled by or through the association, including the lessees and tenants of lands used for the production of such products and any lessors and landlords who receive as rent part of the crop raised on the leased premises. (*b*) If a member of a nonstock association be other than a natural person, such member may be represented by an individual, associate, officer or member thereof, duly authorized in writing. (*c*) One association organized hereunder may become a member or stockholder of any other association or associations organized hereunder."

The state argues that the above provisions mean just what they say and that the 22 individuals, assuming that they are producers, are proper members and stockholders as are the 63 agricultural coöperative marketing associations organized under article 16, chapter 17, Laws of 1935, but the other coöperatives not organized under that section are not proper members and this is a violation of G. S. 1935, 17-1606.

The state argues that the intent of the legislature to limit memberships to associations organized under article 16, chapter 17, Laws of 1935, is further indicated by the fact G. S. 1935, 17-1621, sets up the procedure which a corporation must follow in changing its status to come under article 16, chapter 17, G. S. 1935, and provides that such an association may come under the marketing act by limiting its membership and adopting other restrictions such as a policy of dealing only in agricultural pursuits, as provided by G. S. 1935, 17-1601.

In reply to this argument of the state, the defendant first states a fact, which is not disputed, that all its members are either individual farmers or associations made up of individual producers of agricultural products. It points out section 2 of article 6 of its articles of incorporation, which is as follows:

"The common stock of this association may be purchased, owned and/or held only by producers of agricultural products and associations of such producers, who shall patronize the association in accordance with uniform terms and conditions prescribed thereby and only such producers shall be regarded as eligible members of the association."

G. S. 1935, 17-1603, provides for the organization of agricultural coöperatives as follows:

"(*a*) Ten (10) or more persons engaged in the production of agricultural products may form a nonprofit, coöperative association with or without capital stock, under the provisions of this act."

The defendant calls our attention to the fact that there is no

restriction placed on residence or citizenship. The statute has a section directed to the definition of words as they are used in the act. G. S. 1935, 17-1602, subparagraph (d) provides as follows:

"(d) the term 'person' shall include individuals, firms, partnerships, corporations and associations."

Construing these two sections together the defendant argues that G. S. 1935, 17-1603 (a) should be read as though it provided: ten or more individuals, firms, partnerships, corporations or associations engaged in the production of agricultural products may form a nonprofit coöperative association.

So read the section means that the legislature thought that corporations or associations could engage in farming. Since this practice is generally known to be forbidden by law, however, the only conclusion is that the legislature thought the association took on the status of its individual members. (G. S. 1935, 17-1606, provides in part:

"(a) Under the terms and conditions of its bylaws, an association may admit as members, or issue common stock only to persons engaged in the production of the agricultural products to be handled by and through the association . . ."

Here again we must construe the word "person" to mean "an individual, firm, partnership, corporation or association," and the legislature must have intended that such associations would be identified by the fact that they were made up of producers of agricultural products. This conclusion is fortified by a further provision of G. S. 1935, 17-1606. Subparagraph (b) of that section provides as follows:

"If a member of a nonstock association be other than a natural person, such member may be represented by an individual, associate, officer or member thereof, duly authorized in writing."

The use of this language is a definite indication that the legislature expected those would be members of nonstock associations organized under the coöperative marketing act other than "natural persons." The provisions of G. S. 1935, 17-1606 (c) was actually a definite grant of authority to one association organized under article 16, chapter 17, G. S. 1935, rather than a restriction.

The provisions of G. S. 1935, 17-1613, are of interest to us here. That section provides in part:

"No stockholder of a coöperative association, except another coöperative association shall own more than one twentieth of the common stock of the association . . .

"The bylaws shall prohibit the transfer of the common stock of the association to persons not engaged in the production of the agricultural products handled by the association and such restrictions must be printed upon every certificate of stock subject thereto."

If the theory of the state as to the construction to be given G. S. 1935, 17-1605 were sound, then the first of the provisions set out above would forbid the transfer of stock to other coöperatives organized under the provisions of article 16, chapter 17 of G. S. 1935. The other provision set out, however, is a clear indication of the intention of the legislature to provide that one coöperative society may own stock in another. G. S. 1935, 17-1617a provides as follows:

"Any association may have an interest in or own the preferred or common stock of, or become a member of any coöperative association."

It will be noted that the above section uses the words "any association" not "any association organized under this act." That provision was enacted ten years after the enactment of G. S. 1935, 17-1606, in which it was provided that one association organized under article 16, chapter 17, G. S. 1935, could become a member of any other association organized under the act. The only apparent reason for the enactment of G. S. 1935, 17-1617a would be to clearly provide that one agricultural coöperative association could own stock in another coöperative association regardless of whether or not such association was organized under article 16, chapter 17, G. S. 1935. As has been said heretofore in this opinion, the act should be liberally construed so as to enable it to accomplish the purpose for which it was enacted, to enable the members to better their conditions by bettering their method of disposing of their products and acquiring their supplies. In support of the proposition that a coöperative association takes on the nature of its members the defendant cites and relies on *California E. Com'n v. Butte County Rice Growers' Ass'n,* (Cal.) 146 P. 2d 908; *Big Wood Canal Co. v. Unemployment Comp. Div.,* 61 Ida. 247, 100 P. 2d 49; *Wheat Growers Ass'n v. Sedgwick County Comm'rs,* 119 Kan. 877, 241 Pac. 466; *Georgia Milk Producers C. v. City of Atlanta,* 185 Ga. 192, 194 S. E. 181; *Allen v. Commercial Casualty Ins. Co.,* 132 N. J. L. 269, 39 A. 2d 447; *Wilson v. Israel,* 185 App. Div. 816, 173 N. Y. S. 842; *Yakima Fruit Growers Asso. v. Henneford,* 182 Wash. 437, 47 P. 2d 831; *Industrial Commission v. United Fruit Growers Ass'n,* 106 Colo. 223, 103 P. 2d 15.

There is no contention in this case but that the members of the co-

operative societies which are members of CCA are all engaged in farming or the production of farm products. The regional coöperative society is a natural outgrowth of the coöperative movement generally. There is nothing in the entire act to indicate that it was the intention of the legislature to limit the activity of a coöperative society to the confines of the state. In fact, the very opposite is only a reasonable inference from all the provisions. It is the clear intention of the legislature that locally ten or more farmers could organize to help each other and that on a larger scale these groups could unite for the same purpose. So long as it is farmers helping themselves and each other it matters not whether they accomplish this by an association of individuals or an association of societies. Of only one thing we may be sure—they must all be engaged in the production of agricultural products. The last provision of G. S. 1935, 17-1605, dealing with powers of a coöperative society is "and do any such thing anywhere."

This ends one phase of this case. We hold that the defendant should not be ousted or a receiver appointed for it.

The matter we shall now consider is in the main a controversy between CCA on one hand and the corporation commission of the state on the other. It involves the question of whether CCA is obliged to register its securities with that department of the corporation commission commonly called the "Blue Sky Department."

It will be remembered the state in its petition alleged that the corporation commission had no interest that was antagonistic to the state's interest but was an interested party and should be made a defendant because it had certain regulatory powers over all corporations with reference to their securities and particularly CCA. Later on in its petition the state alleged that CCA had by February 28, 1947, issued and sold $7,120,644 in securities including stock, both common and preferred, deferred patronage refund certificates and certificates of indebtedness without having registered them, as required by G. S. 1935, 17-1226.

In its answer to the state's petition, defendant admitted that it had sold capital stock and certificates of indebtedness and that it had issued patronage refund certificates without having registered them with the corporation commission, but denied the other allegations in the last paragraph of the petition.

In its brief the state sets out G. S. 1935, 17-1628, to the effect that the general corporation laws of the state shall apply to coöperatives

organized under article 16, chapter 17, G. S. 1935, and argues that that section brings the securities of CCA under G. S. 1945 Supp., 17-1223.

The corporation commission filed an answer in which it admitted generally the allegations of the state. It then filed a cross petition against the defendant CCA in which it asked a declaratory judgment as to certain controversies that had arisen between it and CCA. In this cross petition after the formal allegations the commission alleged that CCA was first organized under the coöperative societies act, being article 15, chapter 17, G. S. 1935, and that in 1938 it purported to adopt the provisions of article 16, chapter 17, G. S. 1935, known as the coöperative marketing act, but did not change its charter.

That the charter board on January 25 and March 5, 1947, disapproved of the application of CCA to amend its charter from $2,-000,000 to $12,000,000; that in 1938 when CCA was permitted by the charter board to amend its charter and by proceeding under article 16, chapter 17, the charter board assumed CCA would proceed as a lawful corporation.

The cross petition then alleged that as of February 28, 1947, CCA had sold $958,570 of preferred stock in excess of its authority; that it had sold $2,707,170 of its capital stock without first having registered it with the corporation commission, as required by G. S. 1935, 17-1226, and in addition had sold other securities including deferred patronage refund certificates in the amount of $4,398,674 and certificates of indebtedness in the amount of $14,800 without having first registered them with the corporation commission. The cross petition further alleged that for eighteen months the officers of CCA had circulated advertisements for sale of its securities, which advertisements had not been approved by the commission.

The cross petition then set out certain applications and amended applications wherein CCA asked for the registration of its stock. The cross petition then alleged that notwithstanding Case No. 36,911 *post,* p. 489, whereby CCA was plaintiff and the members of the state charter board were defendants there existed an actual controversy between the corporation commission and CCA. The cross petition then contained the following statement of this controversy:

"The State Corporation Commission contends:

"*a.* That such securities cannot now be registered for the reason that the

same were sold in Kansas without having been registered and in violation of section 17-1226, G. S. 1935, and for the reason that there has vested in each and every purchaser within three years from the date of such purchase of securities, the election to declare said contract for the purchase thereof voidable and this answering and cross petitioning defendant alleges that there are more than 2,000 of such purchasers of such securities within the State of Kansas, and this answering and cross petitioning defendant has no power or jurisdiction to do' or perform any act or issue any order that would in any manner interfere with the enforcement of such vested rights by such purchasers."

"The defendant CAA contends:

"*a*. That as, if and when the amendment to the Charter is made that then and in that event the State Corporation Commission has the power and jurisdiction to register the issue of common and preferred stock and certificates of indebtedness without regard to the violation of section 17-1226, G. S. 1935, and without regard to the fact that Preferred stock had been issued in excess of authority previously granted in the charter."

The cross petition then proceeded to set out the actual controversy which it claimed existed between defendant corporation commission and CCA and in its prayer propounded some seven questions of law upon which it prayed to be enlightened.

We will not burden this opinion by setting out all these controversies because the conclusion we have reached with reference to the first one will not require an answer to the others.

In answer to the cross petition of the corporation commission, CCA alleged many of the facts heretofore discussed herein. It alleged further it was organized in 1931 and came under article 16, chapter 17 of G. S. 1935 in 1938; that both the charter board and the state corporation commission had been fully informed at all times of the business that was being carried on by it; that the matter was brought to their attention again in 1939 and 1940 when some subsidiary corporations were organized and the corporation commission knowingly permitted the defendant, the Consumers Coöperative Association, to issue and sell common stock, certificates of indebtedness and other alleged securities in the state of Kansas without objection and without requiring them to be registered under the Kansas Securities Act; that such action on the part of the defendant was in accord with the long-established policy of permitting farmer coöperative societies to sell securities in the state of Kansas without requiring their registration and that the defendant, the Consumers Coöperative Association, promptly filed the application referred to in the cross petition upon the re-

quest of the corporation commission, to retain its good will notwithstanding that it was the opinion of the defendant that it was not required by law to register its securities and that notwithstanding such an opinion CCA had indicated its desire to meet the requirements of the corporation commission and that any controversies which might exist between the corporation commission and CCA, with the exception of the contention of the corporation commission that the deferred patronage refund certificates of CCA were securities within the meaning of the Kansas Securities Act would be eliminated by the approval of the state corporation commission of the applications heretofore filed with it by CCA for the registration of its securities; that the defendant was informed and so alleged the fact to be it had long been the established practice of CCA to register securities following the issuance and sale of part of such securities prior to their registration, in those instances in which the issuer's failure to comply with the registration provisions of the Kansas Securities Act first came to the attention of the state corporation commission after portions of such unregistered issues had been sold and that this case was the first one in which this question had ever been raised by the corporation commission. Attached to this answer was a statement of the value of the CCA's property and the volume of business done by it during the fiscal year ending August 31, 1946; also a list of investments and securities of CCA. It may be stated parenthetically that there was no contention by anyone in this action that CCA is not sound and solvent and in a flourishing condition. No financial reason is advanced by the state or the corporation commission why these securities should not be registered.

We have heretofore stated in this opinion what the state alleged with reference to CCA's selling its stock without it being registered with the corporation commission. The state did not allege directly that the selling of this unregistered stock was a corporate misdeed. It did, however, just before the prayer in the petition, state that by reason of all acts and omissions herein alleged CCA had breached its corporate duty to the state.

If that question were before us probably we would hold such was sufficient allegation of violation of law that if sustained, and no legal explanation advanced for it, would support a judgment of ouster. However, in its brief the state has not asked that CCA be

ousted from doing business for that reason nor does it argue that is one of the reasons why a receiver should be appointed.

The question of sale of securities that were not registered, in violation of G. S. 1935, 17-1226 is raised in the main by the cross petition of the corporation commission. The corporation commission does not ask that CCA be ousted from doing business in the state or that a receiver be appointed. It only asks for a declaratory judgment answering certain questions of law as to its rights and duties with reference to the present situation and the rights and duties and obligations of CCA and its obligation toward people who have bought its unregistered stock. In its original brief in this case, in answer to the brief of the state, CCA states that the question whether or not CCA should register its securities under the Securities Act does not present an actual controversy between any of the parties. It contends that the law does not require the registering of its securities and that position was accepted by the corporation commission until sometime in 1946, when the corporation commission suggested to the defendant that its securities should be registered and that for the purpose of coöperating with the state officials the CCA did present its securities for registration and does not now and never has raised any objection to the registration.

In such a situation it is doubtful whether an actual controversy exists so that a proper situation is presented for us to decide under the declaratory judgment act. However, this is a public matter. Orderly transaction of the business of the state requires that some of the questions propounded should be answered as expeditiously and with as little dislocation of the business of the parties as possible even though the proceedings are a little irregular in the manner in which the question is brought to us.

We shall proceed therefore to settle such of the legal propositions raised by the corporation commission as we deem necessary to settle the controversy between the corporation commission and CCA.

The question whether or not the stock of CCA is required to be registered should be first settled. We shall proceed to answer that question now. CCA first points out that it is only required by our statute to register such of its securities as are sold in the state of Kansas and that the amount so sold is much smaller than that alleged in the petition of the corporation commission, that is, the amount of $1,197,827. It points out there is no dispute but

that it was not required to register those securities sold prior to 1935, since up to that time a statute was in effect which expressly exempted its securities from the necessity of being registered. CCA also points out that no one knows how many of the above securities were sold prior to 1935.

CCA points out that section 2 (11) of chapter 140 of the Laws of 1929 exempted the securities of coöperative associations from the necessity of being registered and that this section was repealed by chapter 129 of the Laws of 1935. It argues that the above section was repealed because all parties thought the exemption was otherwise provided by law. It contends that its securities are exempt by the language of article 12, chapter 17, G. S. 1935, known as "The Securities Act" and also by the provisions of article 16, chapter 17, G. S. 1935.

CCA first quotes subsection (6), G. S. 1945 Supp., 17-1224, as follows:

"The provisions of this act . . . shall not apply to the following securities: . . . (6) Any security issued by a corporation organized exclusively for . . . benevolent, fraternal . . . purposes, and not for pecuniary gain, and no part of the net earnings of which inures to the benefit of any private stockholder or individual."

It then quotes in part G. S. 1935, 17-1602, as follows:

"Associations organized hereunder shall be deemed nonprofit, inasmuch as they are not organized to make profit for themselves, as such, or for their members as such, but only for their members as producers."

CCA argues that under these two sections it is a nonprofit society and hence under G. S. 1945 Supp. 17-1224 (6) it is exempt. We cannot agree. It is true G. S. 1935, 17-1602, does provide that societies such as this shall be deemed nonprofit. However, G. S. 1945 Supp., 17-1224 provides that two conditions must exist before the securities are exempt under its provisions. One is the corporation must not be organized for gain. Granted for the sake of argument that such condition does apply to CCA the other condition is that it must be organized exclusively for "religious, educational, benevolent, fraternal, charitable or reformatory purposes" as well. We have just used several pages demonstrating to our own satisfaction, at least, that CCA was not organized for any of those purposes even though the statute does say it shall be nonprofit.

CCA next quotes G. S. 1935, 17-1624, as follows:

"Each association organized hereunder shall pay an annual license fee of ten dollars ($10), but shall be exempt from all franchise or license taxes."

Also G. S. 1935, 17-1619, is as follows:

"Any provisions of law which are in conflict with this act shall not be construed as applying to the associations herein provided for."

CCA then points out that G. S. 1945 Supp., 17-1234, provides for fees on the registration of securities and argues that since the registration of the securities would require the payment of a fee and since G. S. 1935, 17-1624 exempts it from all franchise or license taxes, then it must be exempt from registration. To sustain the position that the tax provided by G. S. 1945 Supp., 17-1234 is a license tax, CCA quotes from 37 C. J., pp. 168 and 169, as follows:

"A 'license fee' or as it is otherwise called a 'license tax,' the two terms generally being regarded as synonymous, since the requirement of payment for a license is only a mode of imposing a tax on the licensed business, is the sum exacted for the privilege of carrying on a particular occupation or business.

"The object of a license is to confer a right of power which does not exist without it; and the object of a statute or ordinance requiring such license and in connection therewith a license fee or tax is to regulate and control the occupation or privilege for which the license is granted, so as to subserve the public good or prevent its being conducted in a manner injurious to the public welfare, or to raise revenue, and in its popular meaning, a license fee or tax includes any charge imposed for a license, whether the object is regulation or revenue, or both regulation and revenue.

"If the fee is exacted for the primary purpose of regulating or restraining an occupation or privilege deemed dangerous to the public or to be specially in need of public control, and compliance with certain conditions is required in addition to the payment of the prescribed sum, such fee is a license fee or license tax proper imposed in the exercise of the police power and is not strictly speaking an ordinary tax, especially where the fee does not exceed and is intended to cover the actual expense of issuing the license and inspecting and controlling the occupation; nor does it lose its character as a license fee because it is called a tax in the legislation which imposes it."

This quotation instead of sustaining the position of defendant refutes it. The fee exacted by G. S. 1945 Supp., 17-1234, is not a fee for a license permitting the company to do business. The requirement with reference to the registration of securities bears no relation to the actual business of the company. If it had the capital to carry on its business without selling securities to the public it could have engaged in its regular corporate business without regard to the securities act. Article 12, chapter 17, G. S. 1935, was written to prevent fraud in the sale of worthless securities, not to regulate

the business of the company nor to raise revenue generally. (See *Daniels v. Craiglow,* 131 Kan. 500, 292 Pac. 771.)

G. S. 1935, 17-1226, provides:

"No securities, not exempt by section 2 [17-1224] hereof, shall be sold within the state of Kansas except in a manner exempted by section 3 [17-1225] hereof, unless or until such securities have been registered as herein provided."

We have already demonstrated that the common and preferred stock and the securities called certificates of indebtedness were not exempt by G. S. 1935, 17-1624. CCA does not argue that its securities other than its deferred patronage refund certificates are sold in such a manner as to bring the transactions within the exemption of G. S. 1945 Supp., 17-1225. . The regulation of securities such as described in article 12, chapter 17, G. S. 1935, is a matter within the police power of the state and the exemptions will be strictly construed.

CCA does not contend that the fact the corporation commission permitted it to sell its stock without having it registered confers on it the right to sell it without registering it regardless of the law. It only relies on what it argues was such a practice of the commission as a reason why it should be freed from some of the consequences of having sold some stock without registering it.

We proceed to that question now. We have a situation where we have held that the stock of CCA was required to be registered. There are now pending before the corporation commission applications to register this stock. The corporation commission asks us what are its rights, powers and duties in the premises.

The corporation commission contends that it now has no power, authority or jurisdiction to register the securities of CCA because in the first place it argues to do so would violate G. S. 1945 Supp. 17-1229. That is a long section consisting of some ten subparagraphs with subdivisions of these paragraphs. It has to do with the duties of the commission in granting, denying and canceling authorization to sell securities tendered to it. It covers the process of investigations and inspection of physical assets of corporations which tender securities to be registered, examination of their books and manner of doing business and other details. Subparagraph 2 provides in part:

"If the corporation commission shall find . . ."

Then we find several conditions which the legislature thought would render a security not a proper security to be sold to the public

in this state. Finally in subparagraph 11 of subparagraph 2 we find the following provision which refers back to the provision just mentioned:

"That there has been a violation of any of provisions of this act or of the orders of the corporation commission, of which such issuer has notice . . . (12) . . . it shall reduce its findings to writing and refuse an authorization to sell to the applicant of the sale of such securities, and it shall thereafter be unlawful for any person to sell or offer for sale any of said securities in this state."

The corporation commission takes the position that it is strictly bound by the above statute that since all parties admit that CCA did sell some securities without having them registered and this was a violation of one of the provisions of the act, which forbids such sale, the only course it can take is to reduce its findings to writing and refuse the permit to sell for which CCA has applied.

In this case there has been no contention on the part of anyone that there was anything wrong with the fiscal structure or the practices of this company with reference to the sale of its stock or with the manner in which CCA conducts its business other than those that have been dealt with heretofore in this opinion, so that none of the other conditions set out in G. S. 1945 Supp. 17-1229 requiring the denial of a permit exist.

If the position of the corporation commission be correct, then two alternatives would be presented to CCA, either it could cease the sale of stock altogether and curtail its operations and activities accordingly or as a second alternative it could make arrangements to bring out a new issue of stock and make application for permission to sell it. In that case the corporation commission would not find that any of that issue had been sold in violation of law as far as this record discloses and no reason for denying the new issue to be sold would appear.

We do not wish to be regarded, however, as prejudging what the result would be if the commission should on the new application proceed to have investigation of the CCA made, which is provided for in G. S. 1945 Supp. 17-1229.

This proceeding was instituted as a quo warranto action wherein a judgment of ouster against the defendant and appointment of a receiver was asked. We have demonstrated that none of the other reasons advanced for ouster of CCA by the state are good. We have pointed out that if other conditions warranted it the petition would sustain a judgment of ouster on account of a violation of

which we have spoken. However, all parties agree and it is generally acknowledged that officials of the state, including the corporation commission and the charter board, did have knowledge through applications that have been made to the corporation commission and the charter board that for several years prior to the institution of this action CCA was selling its securities without having them registered. There is no dispute but that the matter was the subject of conferences between representatives of CCA and these officials and it was concluded that the statute did exempt such securities from the necessity of being registered. Up to the time this case was finally submitted to us and received our final determination there was grave doubt as to whether the statute did require the registration of these securities. After the judgment of this court is entered it will be finally settled for the first time. This court does not always decree ouster of a corporation and appointment of a receiver when evidence has been presented to it that the corporation has violated the law or is guilty of some corporate misdeed of usurping power. We have on several occasions only decreed a partial ouster or we have announced the law and directed the corporation to mend its illegal practices or take whatever steps were necessary to bring it within the law as we announced it. (See *Gas Service Co. v. Consolidated Gas Utilities Corp.*, 145 Kan. 423, 65 P. 2d 584, and *State, ex rel., v. Sage Stores Co.*, 157 Kan. 404, 141 P. 2d 655, rehearing denied, 157 Kan. 622, 143 P. 2d 652.)

The position with which we are confronted is somewhat analogous to this. The violations of law upon which the charter board bases its argument were not found as a result of any investigation carried on by the commission. The sale of this stock without registration was openly and notoriously done and it was not a surreptitious violation of the law which the commission unearthed by means of the detailed investigation G. S. 1945 Supp. 17-1229 provides for. We think it would be a strained and strict construction of the statute not called for under the circumstances for us to hold under all the surroundings facts and circumstances that G. S. 1945 Supp. 17-1229, subparagraph 11, should be given the construction for which the corporation commission contends.

In connection with this argument the corporation commission also calls our attention to G. S. 1945 Supp. 17-1240. The section reads as follows:

"Every sale or contract for sale made in violation of any of the provisions

of this act shall be voidable at the election of the purchaser; . . . in an action at law in any court of competent jurisdiction upon tender to the seller in person or in open court of the securities sold or of the contract made, and of any income from such securities or contract for the full amount paid by such purchaser, together with all taxable court costs and reasonable attorney's fee in any action or tender under this section: *Provided,* That no action shall be brought for the recovery of the purchase price after three years from the date of such sale or contract for sale . . . *Provided further,* That no purchaser otherwise entitled shall claim or have the benefit of this section who shall have refused or failed within thirty days from the date thereof to accept an offer in writing of the seller to take back the security in question and to refund the full amount paid by such purchaser, together with interest on such amount for the period from the date of payment by such purchaser down to the date of repayment, such interest to be computed: . . . less, in every case, the amount of any income from said securities that may have been received by such purchaser."

The corporation commission contends that when any person bought stock or other securities from CCA which had not been registered that under the provisions of the above statute he became vested with the right to tender that stock back, together with the income it had received from it, to obtain a judgment for the amount paid for it, together with a reasonable attorney's fee. The corporation commission asks us to decide the rights of the purchasers of this stock with reference to that statute. There is no purchaser of stock before us in this case. We do not know whether any purchaser of this stock will ever seek to take advantage of the provisions of the statutes. No matter what we concluded we would not at this time adjudicate the rights of some purchaser of stock in the absence of his being a party. We have reached the conclusion that the stock should be offered for registration, however, and that the commission should proceed to hear the application and decide whether or not it would permit it to be registered and sold. We further wish to state with reference to the provisions of G. S. 1945 Supp. 17-1240, that we do so without prejudice to the rights of any purchaser of these securities under that statute.

The remaining question in this case is whether the deferred patronage refund certificates must be registered before they can be sold. These certificates are issued pursuant to article III, section 1, subsection (c) of the bylaws of CCA. This section provides as follows:

"The remainder of the said net savings of the wholesale department, if any, shall be paid on a patronage basis to all patrons who have done business with

the association. In order to provide for capital, the payment of all or any part of the patronage refunds may be made in deferred patronage refund certificates: provided, however, the patronage refunds of patron associations shall be paid in stock until the total amount of stock so paid shall be equal to at least five (5) percent of the capital each uses in departments supplied by the association."

And subsection (*d*) of these bylaws provides as follows:

"Patronage refunds of the retail department shall be paid out of the savings of the retail department to all .its patrons, provided the patronage refunds of non-shareholders shall be set up to their credit. When said credit equals $10 a participating membership certificate shall be issued to such patrons."

The provisions of G. S. 1935, 17-1226 apply to the sale of securities. It is the sale of that which is forbidden by the act. There are two questions to be determined here: First—Are "deferred patronage refund certificates" securities? Second—Is the method by which those certificates are distributed a "sale" of them? We find it unnecessary to answer the first question. We choose to place our conclusion upon an answer to the second question. These certificates are the means of passing on to .members the savings made through trading with the society. Occasionally one of these certificates is issued to a patron who was not a member, but such, as we have seen, was only incidental. The certificate bears on its face the statement that the amount for which it was issued will be payable at a time and in a manner to be determined by the board of directors and shall be such a rate of interest as shall be determined by members at the annual meeting. Matters of this sort are by statute left to the discretion of the society. G. S. 1935, 17-1609, provides as follows:

Each association incorporated under this act must, within thirty (30) days after its incorporation, adopt for its government and management a code of bylaws, not inconsistent with the powers granted by this act. Each association under its bylaws may also provide for any or all of the following matters:

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"(*j*) The amount of annual. dividends which may be paid on the common or preferred stock, which shall in no case exceed eight percent, and the manner in which the remainder of the association's profits shall be prorated in the form of patronage dividends to its several stockholders or members upon their purchases from, or sales to, the association or upon both such purchases and sales."

These certificates are distributed on the basis of the year's busi-

ness. The bylaws passed in conformity with the statute require that some such distribution be made. The only thing left to be determined is the amount and the terms of payment. Such a transaction is not a sale. Furthermore, subparagraph 4, G. S. 1945 Supp. 17-1225, excludes from sales coming under the act:

"The distribution by a corporation of . . . securities, to its . . . security holders or their respective assigns, as a . . . distribution out of earnings or surplus . . ."

The issuance of the deferred patronage refund certificates is such a transaction as was excluded by the above statute.

As to the prayer for ouster of the defendant CCA from the state, judgment will be for the defendant.

As to questions propounded by the corporation commission we hold that the common and preferred stock and certificates of indebtedness of defendant are required to be registered with the corporation commission before they can be sold in this state; the commission has jurisdiction and power and it is its duty to proceed to hear and determine the application of CCA for permission to register these securities; the securities sold in Kansas without being registered should be registered if the commission on final hearing determines that the issue should be registered; this registration, however, is not to prejudice the rights of any buyer of this stock under the provisions of G. S. 1945 Supp. 17-1240; the deferred patronage refund certificates are not required to be registered.